Michael T. ANDERSON,
Plaintiff-Appellee,

v.

GREAT LAKES DREDGE & DOCK
CO., Defendant-Appellant.

No. 259, Docket 74–1779.

United States Court of Appeals,
Second Circuit.

Argued Oct. 31, 1974.

Decided Dec. 17, 1974.

Joseph A. Cohen, New York City (Sidney A. Schwartz, Alexander, Ash, Schwartz & Cohen, New York City, of counsel), for defendant-appellant.

John F. Haggerty, Brooklyn, N. Y. (John J. Corcoran, Matthew L. Danahar, Kew Gardens, N. Y., of counsel), for plaintiff-appellee.

Before LUMBARD, MOORE and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

This seaman's action for damages for personal injuries allegedly caused by defendant's negligence and the unseaworthiness of its dredge was tried by a jury in the Southern District of New York and resulted in a verdict awarding $500,000 damages to the plaintiff, which was reduced to $250,000 by reason of plaintiff's contributory negligence. Defendant appeals, contending that plaintiff failed to prove that the alleged negligence and unseaworthiness caused the accident, that certain of the trial judge's rulings were erroneous and highly prejudicial to it, and that the damage award was grossly excessive. We reverse and remand for a new trial.

The accident forming the basis of the suit occurred on October 18, 1970, when plaintiff, a crew member engaged in the operation of a winch used to pull wire into an enclosed cab aboard defendant's dredge (a floating vessel used to dig river channels) and wind it onto a drum, suddenly was pulled or fell into the winch and catapulted over its moving drum, suffering serious injuries. The overall width of the winch was 22 inches, including the rotating drum, which was 10 inches wide and 24 inches in circumference. It was controlled by means of a small hand lever on its right side. At the time of the accident plaintiff was standing to the left of the moving wire, using his right hand to operate the winch lever and his gloved left hand to guide the wire so that it would wind evenly around the drum.

Plaintiff claimed that the accident was caused by defendant's failure to furnish him with sufficient help to operate the winch and perform certain other related tasks and by a defect called a "fish hook" (a curled broken strand of wire) on the moving cable, which caught his gloved hand and pulled him into the winch. He contended that three men should have been furnished to do his job: one to move the winch lever, a second to pat and guide the wire onto the winch drum and a third to stand at the door of the cab to relay any signals or instructions from the operator of an adjoining scow. The defendant denied these claims, contending that the operation of the winch was a one-man job, that there was no defect in the wire cable being

wound onto the drum, and that the accident was caused wholly by plaintiff's own negligence in positioning himself improperly to the left of the moving wire, which required him to bend his body over it to reach the operating lever, and in touching or tapping the moving wire with his left hand in order to guide it. With the issues thus joined the case went to trial.

### The Trial

Since the sole witness to the accident was the plaintiff, who was alone in the cab when it occurred, his testimony and his credibility were crucial to his case. The trial judge's rulings on examination and cross-examination of the plaintiff, therefore, assumed more than their usual importance.

The testimony of plaintiff, who was the first witness to take the stand, was relatively uneventful until he described how the accident occurred. He then stated that, after he had started the tugger winch to wind up the wire cable and the drum was making its first three turns, his "hand got caught" on the cable, pulling him toward the drum. Thereupon for eight pages of the transcript the trial judge took the examination out of the hands of plaintiff's counsel, questioning the plaintiff in detail and at length, and, with the aid of leading questions, inducing plaintiff to demonstrate to the jury by motions and gestures his recollection of how the accident occurred, accompanied by his verbal description. In answer to the court's inquiry as to how his hand got caught in the wire cable, the following occurred:

"The Witness: I believe it was a fish hook on the wire.

"The Court: A fish hook?

"The Witness: Yes, a piece of wire that broke off.

"The Court: And your hand got caught on that?

"The Witness: Yes, sir.

"The Court: And it pulled it right in: is that what you mean.

"The Witness: Yes, sir.

"The Court [to the jury]: Do you get it? Now [apparently to the jury], you are not allowed to ask any questions. I can ask the questions.

Do you understand what he is doing?

Now I will take any suggestions from the jury as to what you would like to have him demonstrate in connection with this endeavor.

Are there any questions?

"Juror No. 7: I would like to see him demonstrate the speed with which his hand went toward the drum.

"The Court: Can he do that? Can you demonstrate the speed with which your hand went forward to the drum when it got caught on the fish hook?

"The Witness: Quite fast.

"The Court: Show us. Demonstrate it, for heaven's sake.

"The Witness: My hand got caught and that was it." (App. 80–81)

Plaintiff further testified that normally three men are assigned to do the wire cable-rewinding job, one to operate the tugger winch lever, one to guide the wire on to the drum and one to stand by the cab door to watch the wire outside and relay signals from the deck to the winch operator.

Upon cross-examination plaintiff conceded that for this particular type of operation only two men went to the cab at the beginning and that there was no standard procedure as to how the five men on the entire job would be dispersed, the assignments being made by the mate. His theory, he testified, was that if another man had operated the winch lever that man might have stopped the winch sooner, before plaintiff "got his hand wrapped around it." However, his testimony had been that the accident occurred very fast, as the first three turns of the wire, each 24 inches long, were wrapped around the drum, and that plaintiff would know sooner than the lever operator when plaintiff's left hand had been caught by the wire and pulled into the drum.

In view of the uncertainty of plaintiff's testimony as to how the positioning of a separate winch operator in the cab might, in the absence of specific proof as to how the accident happened, have prevented it from occurring, plaintiff's testimony to the effect that his gloved left hand being used to guide the cable on to the drum was suddenly caught by a "fish hook" (i. e., a curled broken strand of wire), assumed considerable importance, since such a defective cable could constitute a separate basis of liability. Accordingly defense counsel confronted plaintiff with his sworn pretrial deposition testimony to the effect that he did not know what happened at the time of the accident. Plaintiff further conceded on cross-examination that he did not know whether there was any "fish hook" on the wire cable being hauled at the time of the accident. Counsel for the defendant thereupon quite properly moved to strike plaintiff's earlier testimony, given on direct, to the effect that the accident occurred when his gloved left hand had been caught by a "fish hook" and pulled into the drum.

At this point in the trial the court, instead of granting the motion and instructing the jury to disregard the earlier testimony, again took over the questioning of the plaintiff and elicited, in the presence of the jury, testimony to the effect that while plaintiff neither felt nor saw any "fish hook," he "deduced" that it must have been a "fish hook." (App. 233). Specifically plaintiff testified, "Your Honor, I said something caught my hand and pulled it. The only thing I could imagine it could be was a fish hook." [1] In response to the defense's renewed motion to strike, the court reserved decision in a statement which indicated sympathy for the plain-

1. "Mr. Cohen: If your Honor please, I would like to make a motion to strike that testimony that he gave earlier today since it's based on what could have been.

"The Court: Sir, will you give me a chance to have this thoroughly explored? That's all I care about. I don't care who is going where. All I want is that those people should know what is the testimony. That's my job here. That's all I care about.

Now, listen. This morning I remember distinctly because I think I asked that question myself—

"The Witness: Yes, sir.

"The Court: When I was demonstrating it. Do you remember?

"The Witness: Yes, sir.

"The Court: It was with the drum. I asked you what happened and you said something to the effect that while you were feeding—

"The Witness: The wire.

"The Court: The wire, meaning the cable your hand got caught on to, your finger, to a fish hook in the cable.

"The Witness: Yes, sir.

"The Court: And before you knew it your hand was pulled right into the drum; right?

"The Witness: Yes, sir.

"The Court: What makes you say that there was a fish hook? What do you base that on? You didn't see it with your eyes, did you? Did you see it with your eyes?

"The Witness: No, sir.

"The Court: All right, so how do you know it was a fish hook?

"The Witness: Because my hand got caught.

"The Court: So you felt it; is that what you mean?

"The Witness: I felt my hand being pulled.

"The Court: But how do you know it was pulled because of a fish hook?

"The Witness: I believe there was no other reason?

"The Court: I see. So you deduced—you figured it out that way, that it could not have been any other reason, it must have been a fish hook; is that what you mean?

"The Witness: Yes, sir.

"The Court: But actually that's the sole reason for your saying there was a fish hook?

"The Witness: My hand got caught and it was pulled.

"The Court: Couldn't it have been pulled without a fish hook?

"The Witness: No.

"The Court: So you figure in your mind that it must have been a fish hook?

"The Witness: Yes, sir.

"The Court: But actually you didn't either feel or see a fish hook, am I right?

"The Witness: Your Honor, I said something caught my hand and pulled it. The only thing I could imagine it could be was a fish hook.

"The Court: All right, we have this answer. That's his answer." (App. 231–34).

tiff's position.[2] Defendant's counsel then, after considerable colloquy between the court and plaintiff, was permitted to read a portion of plaintiff's sworn pretrial deposition to the effect that he did not know what had happened when the accident occurred. He then sought to bring out that plaintiff had understood the questions put to him when his deposition had been taken. Earlier the court on its own had elicited from plaintiff that he was "nervous" when the deposition was taken. Now plaintiff testified that he had been "nervous and scared and—didn't know—what the story was." (App. 239).

Faced with this explanation of the sharp inconsistency in plaintiff's testimony regarding the most crucial aspect of the entire case, defense counsel brought out that shortly before trial plaintiff had twice read and then had signed a transcript of his deposition testimony. When the defense then quite properly asked plaintiff whether, after reading through his testimony, he had made any changes to reflect the different version given in his trial testimony, the court sustained an objection, stating:

"The Court: It is clear to me that the witness is now saying that testimony of the answers he gave in that deposition were answers due to fear, et cetera, et cetera.

"Mr. Cohen: To what? I'm sorry, your Honor. I missed a word.

"The Court: Answers that were due to fear; that he had apprehension that

he says he had at the time, but he made it clear that the questions and the answers that are reflected in that deposition were the questions put to him and the answers that he gave. That's an entirely different thing." (App. 244).

After the defense then elicited from plaintiff that he had read the transcript in his own home, the following occurred:

"Q. When you read it at home you weren't nervous, were you, sitting in your home reading this?

"A. No, sir.

"Q. Now, at the time you were at home reading this written transcript through at least twice, did you make any changes so as to better express what you say you wanted to express?

"The Court: *You still haven't got the point and you are wrong. You are wrong, sir.*

"Mr. Cohen: Your Honor—

"The Court: No, I am saying so and I will give you a chance to correct it. The witness's position is that the transcript does accurately reflect what he said. *He has no power to change it. He wouldn't dare change a word of that.* He can only ask himself 'Did I say that on that occasion.' He insists that he did say it. There is no question about that and, *therefore, he had nothing to correct,* but when he did give that testimony, in certain areas the answers he gave as they are reflected do not constitute the height of accuracy because at the time he was

2. "Mr. Cohen: May I renew my motion, your Honor?

"The Court: After you are through developing the entire testimony with regard to it. He may have said something that—you have got to bear in mind that the development of testimony, which you know as well as I do, has a great deal to do with the ability of the witness to express himself. We can't get witnesses made to order in the sense that they have the ability to employ the language which will best express what they want to utter and our function is to take the halt, those who have difficulty, and we have got to be patient enough to stay with it until we extract what it is they wish to convey. It may take 20 times as

long, but that's the only way. With such a witness, at first blush, an answer looks one way and pursuing it a little further, the answer takes on a different complexion. So, if you will bear with an impatient judge who is trying to exercise patience with a witness who concededly has limited powers of expression, which is not that to which he is accustomed, any more than I am accustomed to handling the tools with which he is familiar. If we will bear that in mind, then the Court will have a much clearer picture on which to predicate a ruling as to whether or not his testimony as to the fish hook stands or should be stricken.

Thank you for your attention." (App. 234–35).

nervous, et cetera. Is that not the position?

"Mr. Danahar [plaintiff's counsel]: Exactly, your Honor. (Emphasis added) (App. 245–46).

\*    \*    \*    \*    \*    \*

"The Court: What you are saying is that some of those answers were not accurate because while you did give them, you gave them because you were nervous?

"The Witness: Yes, sir.

"The Court: Isn't that what you are saying?

"The Witness: Yes, sir.

"Mr. Cohen: May I at this time ask your Honor for a charge to the jury that the Federal Rules of Civil Procedure permit a witness who has testified on a deposition to make corrections in his testimony at the time he signs the same if upon reading it over he finds he made errors?

"The Court: I will not so charge. I will say that that is the position of this witness with regard to that deposition regardless of whether or not there is a rule such as you quote. That's what his position is. It's for the jury to determine whether they want to accept it.

"Mr. Cohen: I am asking your Honor for a charge to the jury to say that the law permits a witness to make changes in his deposition if upon reading it over he finds errors. I ask your Honor to so instruct the jury that that opportunity was afforded to the witness because I believe your Honor has said to them that he couldn't possibly make any changes.

"The Court: Sir, you heard what the Court said. You will have your opportunity between now and the time of the charge to say anything further. I refuse to say anything further on that score right now. We have developed what the witness's position is with regard to that deposition and I have done that as thoroughly as I know how. At any rate, you give me

whatever you wish by way of a commentary that I can make at the appropriate time. All I am concerned with, I repeat, is what is this witness's sworn testimony as he sits on that stand before this Court and this jury and that, I think, has been established. You can argue later on, if you wish, that there was an opportunity; that the law says this, that and the other, but that's got nothing at all to do with what his position is right now as to his sworn testimony with respect to that deposition. If they want to believe it, that's their province. If they want to disregard it, that's their province, but I want them to know what his position is regardless of what the law has got to say; regardless of what the rules may have. Do you get my point?

"Mr. Cohen: Yes, your Honor.

"The Court: That's the way it is.

"Mr. Cohen: May I, in the absence of the jury, meet with you, opposite counsel and the court reporter?

"The Court: Ladies and gentlemen of the jury, it is now half-past four. You have had a full day. I told you when we started yesterday that the attorneys would do their level best to move this case along and they have. You know, Mr. Danahar could have no idea how long Mr. Cohen will take on cross-examination. This little bit of interplay here runs into a substantial period of time. I would venture to suggest that on this very little item dealing with the point just raised by Mr. Cohen, we might have spent fully 35, 40 minutes.   .   .   ." (App. 247–49).

After the jury was excused the defense, moving for a mistrial, argued that the court had erred in ruling that the plaintiff could not under the federal rules have corrected the transcript of his deposition testimony and in stating in the jury's presence that the defense was "wrong" in asking plaintiff whether he had done so. Thereupon the following occurred:

"The Court:   .   .   .   [W]hat you are incensed about is that he didn't

change those answers to reflect the truth under circumstances at his home when he was not nervous, *and my answer to that is that he was never so instructed that he could change it to accord with the truth and to be more accurate. Mr. Danahar, you, as a lawyer, do you say on the record that you told him he could change it if it was not accurate?*

"Mr. Danahar: I say on the record that I did not tell him that they could be changed if they were not accurate.

"The Court: All right.

"Mr. Cohen: May I ask, Mr. Danahar, do you, as a lawyer, state for the record that Mr. Anderson told you there were inaccuracies in his testimony, when he signed it?

"Mr. Danahar: At the particular time that he signed this yesterday, there was a discussion between us, and he acknowledged that there were inaccuracies, one of them being the very inaccuracy that Mr. Cohen has raised just recently."[3] (Emphasis added) (App. 254).

3. The colloquy continued, with the court expressing irritation with defense counsel's position.

"Mr. Cohen: Your Honor referred to my opening and in my opening I said that the claim being made by Mr. Danahar in his opening was contrary to the sworn testimony given by this plaintiff just two months before. Now, in an effort to wedge themselves out of what they said two months before, we get a contention that 'I was nervous when I testified two months before.' Judge, you may believe it, or you may think the jury believes it, but I am not bound to accept it in representing my client. We don't believe he was nervous or didn't understand. These were simple questions in simple English, and I want to show that even if he was nervous at that time and didn't well express himself in responding to very simple questions. He had ample opportunity in the two months that have elapsed since when he read this over twice, in the leisure of his home, not surrounded by lawyers, and in the times he spoke to Mr. Danahar, to make corrections of any inaccurate testimony he claims to have given and all I am saying to your Honor is that the Federal Rules permit such testimony to be corrected when it's inaccurate.

"The Court: You are ducking the essence of this, Mr. Cohen. I am sorry to have say that, but it's quite clear that you are. It's quite clear to me now that Mr. Danahar has spoken up, that Mr. Danahar never told this fairly ignorant, apparently ignorant witness that he could change the answers of the deposition if they did not accurately represent the truth. Whether the rule says so or not, the fact remains that Mr. Danahar did not inform this witness that he could make changes if the answers were not accurate or truthful. Mr. Cohen did not develop that this witness—I repeat, clearly restricted in intelligence—he did not bring out through the witness that the witness knew that the witness could change the answers of the deposition if they did not reflect accurately or truthfully the facts. It is quite clear that the witness and Mr. Danahar addressed themselves to one point, and that is does the deposition reflect the questions that were put and does the deposition reflect the answers that were given.

Now, I see nothing to the abuse that Mr. Cohen is laboring under. He has gotten the witness to say that some of his answers were not accurate, even though the way they appear in the deposition was the very answer he gave. It seems to me that the very purpose that Mr. Cohen wishes to accomplish has been accomplished. If the jury wishes to adopt his interpretation, and insofar as saying your Honor may believe or the jury may believe or your Honor may think the jury believes—that has nothing at all to do with the issues involved here at all. I am not reflecting on whether I believe the witness or don't believe the witness. I want the witness's testimony, however, so the jury can know what his testimony is. To that end, I devoted a lot of time in order to find out just what it is that he wishes to convey. Frankly, I don't hesitate to say, since Mr. Cohen raised it, that I have considerable doubt as to whether this witness entertained at the time of the deposition the fear and apprehension that he says.

I am not sure one way or the other, but that, I repeat, has nothing at all to do with the Court's endeavor, which was to lay before the jury what is the position of this witness with regard to the deposition, and that's all I am concerned with.

\* \* \* \* \* \*

"The Court: Sir, the record is clear now.

"Mr. Cohen: Yes, sir.

"The Court: I think Mr. Cohen has— frankly, I think he pursued the matter be-

The defendant's motion for a mistrial was denied.

When the court reconvened on the following day, the trial judge, in a lengthy instruction to the jury purporting to "clear up any misapprehension" regarding plaintiff's right to correct his deposition, referred again to the plaintiff's fear at the time his deposition was taken and advised the jury in response to the suggestion that the plaintiff had had a chance to change his deposition that "it isn't as easy as that." Over defense objection the judge then elicited from plaintiff that until the previous day no one had told the plaintiff that he had the right to change any inaccurate answers. The court further informed the jury of the previous day's statement of plaintiff's counsel, which the court had elicited in a colloquy, that he had never told plaintiff that he had a right to

change inaccuracies in his deposition answers before signing and swearing to it. The court then instructed the jury at considerable length regarding the procedure under the federal rules governing a witness's changing his pretrial deposition testimony, at the conclusion of which the defendant's renewed motion for a mistrial was denied.

When, upon resumption of trial, defense counsel, without objection by the plaintiff, proposed to read into the record plaintiff's entire deposition testimony, the court, with the jury present, expressed irritation at counsel's lack of courtesy in failing to advise it of their agreement that this procedure might be followed. (App. 282–83). Defense counsel responded that since there had been a suggestion that he was "picking and choosing" portions of plaintiff's deposition he wished to avoid any such conten-

yond necessity. I think he got the witness to answer and was not content with it and as often happens on cross-examination, he overplayed his hand and now he is ready to shift the burden to the Judge because the Judge happened to say, did he have the power to make the accurate answer—to change the answer to reflect greater accuracy. My answer to all of that is simply that there is no harm whatever. Conceding Mr. Cohen is right, there is no harm whatever to bring that out at the appropriate time. It's got nothing at all to do with what this witness has to convey with regard to his sworn testimony as to that deposition and its contents and what he did when he got it. When he got it, he read it twice from beginning to end and a third time he looked at extracts of it and it was just yesterday that he signed it under circumstances that the record eloquently demonstrates. The oath had to be administered to him in my presence. That's how belated it was. But those are the facts and it's clear, overwhelmingly clear that at no time was this witness told that he could change that deposition in order to have it reflect the accuracy that he now maintains it lacks. That's all there is to it. At the appropriate time we will take up the point dealing with the rules. The jury has his testimony and I say, further, it would be pulling the wool over the jury's eyes— which I am sure Mr. Cohen would not want to do any more than any of us—if we were to leave that record, let that record convey the impression as he sought to have the Court say that this witness had the power

to change those answers without first developing that he was on notice that he could do so. That would be highly improper and I do not accuse Mr. Cohen of engaging in such tactic. The witness has sworn that these were the questions, these were the answers he gave and then counsel wants to have the Court charge the jury right there and then that the witness had the power to change those answers if he saw fit in order to accord with what he maintains is more accurate or more truthful.

"Mr. Cohen: I asked for a charge at that time only because your Honor has just before that charged the jury that the witness could not make any corrections and I thought this would be the appropriate time to correct that.

"The Court: There may be something in that, but I see nothing fatal. I deny the motion in toto. There is absolutely no merit to it as I see it. Now, gentlemen, the Court states further that you both ought to consider whether that entire deposition should be laid before the jury for the reasons already indicated, but for the additional reason that the witness has said that he was asked the same sort of question many times and that on many occasions he gave what he maintains were accurate answers, but on other occasions he did not, and the issue is whether or not Mr. Cohen has picked out only the inaccurate answers and neglected to give the answers of the witness on the other occasions in the course of the deposition which accord with the truth." (App. 255–60).

tion by following a procedure which would permit the jury to have the entire context in which plaintiff's statements were made. There followed in the jury's presence a sharp castigation of defendant's counsel by the court, which is reproduced in the margin.[4]

At this point in the trial the court ordered to his feet a spectator named Ardizzone and interrogated him in the jury's presence regarding the spectator's behavior, which the court characterized as showing "disgust openly with what I am doing." (Later the court described the conduct as "slumping in your seat and turning your head with disgust.") The spectator denied any such intention and agreed, in response to the court's admonition to "behave yourself," that he would do so. The court, however, then pursued his interrogation further, bringing out in the jury's presence that the spectator was "with the carrier," [5] which provoked a defense motion for a mistrial

[4]. "The Court: Are you through?
"Mr. Cohen: Yes, sir.
"The Court: What was the reason for that tactic?
"Mr. Cohen: I am sorry, sir? What—
"The Court: What was the reason for that tactic you just employed right now? Did I say anything to the contrary? Or did I say you owed it as a matter of courtesy to let me hear what your opponent has to say with regard to opposition to what he—
"Mr. Cohen: I have no objection to that. But I understand that the practice is, your Honor, that I have a right to start to read, when I come to something he objects to he has the right to stand up and object. That is the fashion, it has always been done to my experience.
"The Court: Well, you are all wrong and you know full well you are all wrong. All you want to do is make a recital. I will let you make a recital at the appropriate time. I don't want you doing things or saying things that are contrary to my understanding of what took place." (App. 284).

[5]. "[The Court]: . . . I repeat, yesterday afternoon I told counsel that I think that substantial portions—Who is that man over there? Get up, sir. On your feet. What is your name?
"Mr. Ardizzone: Mr. Ardizzone.
"The Court: Are you a witness?
"Mr. Ardizzone: No, sir.
"The Court: Are you interested in this case?
"Mr. Ardizzone: Just to watch the proceedings.
"The Court: Are you a lawyer?
"Mr. Ardizzone: No, sir.
"The Court: Well then, you sit there with respect. Say anything and do anything you want outside. Did you understand what I said?
"Mr. Ardizzone: Yes, sir.
"The Court: Get up on your feet when I talk to you.
"Mr. Ardizzone: Excuse me, sir.
"The Court: I won't have you show disgust openly with what I am doing. I know when a man shows it. Do anything you want outside, mister, not in my presence.
"Mr. Ardizzone: Excuse me, sir. It wasn't my intention.
"The Court: Well then, behave yourself.
"Mr. Ardizzone: Yes, sir.
"The Court: Come forward. Come forward. Give your name and address for the record. Stand right there. What's your name?
"Mr. Ardizzone: Roy Ardizzone.
"The Court: Where do you live?
"Mr. Ardizzone: 2047 East 13th Street, Brooklyn.
"The Court: Are you known to these parties?
"Mr. Ardizzone: Which parties? Excuse me.
"The Court: The plaintiff or the defendant?
"Mr. Ardizzone: To Mr. Cohen.
"The Court: What have you got to do with Mr. Cohen?
"Mr. Cohen: May we approach the bench, your Honor?
"The Court: No. I want this out in the open. What have you got to do with Mr. Cohen?
"Mr. Ardizzone: I'm with the carrier.
"The Court: You are with the carrier?
"Mr. Ardizzone: Yes, sir.
"The Court: Sit down."
(App. 284–86).
It later was developed that Ardizzone was the manager of the compensation department of the Manhattan office of Kemper Insurance Company, which is the insurance carrier for the defendant. Out of the jury's presence the court interrogated him and rejected his apology and denial of intent to show disrespect, as follows:
"The Court: Now, Mr. Ardizzone, I want you to know, and I want the record to show that you distinctly showed in my presence a disrespect by slumping in your seat and turning your head with disgust.
I have been a fact finder for forty-five, fifty years. I have disbarred lawyers in my time and helped remove Judges. I have exposed crooks in Government and in pri-

that was denied. There followed a lengthy review by the court of its version of the proceedings that had led to its earlier statements, with blame being placed on defense counsel for the court's predicament.[6]

From this point on the record discloses the development of a hostile climate in the courtroom, with expressions by the trial judge in emphatic terms of his displeasure with defense counsel's conduct of the trial. When defense counsel, for instance, without objection by plaintiff's counsel, renewed his proposal to read plaintiff's entire deposition to the jury, including portions that were consistent

vate industry. I'm a pretty good fact finder, and I know when a man misbehaves in my presence.

"Mr. Ardizzone: May I make a comment, sir?

"The Court: No, I want the record to show that I intend to explore this further. You will show respect, not for me, I don't care about your respect, mister, but for the courts. Some of you fellows act like cheap bail bondsmen. You belittle the courts. You belittle Judges. You sneer. You snort.

Now, what do you want to say?

"Mr. Ardizzone: I'm sorry if I gave that impression believe me. That was not my intent.

"The Court: You are false. It was your intent and you clearly displayed it. And I may very well hold you in contempt.

"Mr. Ardizzone: I'm sorry if I gave that impression, but it's——

"The Court: You are not sorry. That is hypocritical. You are just using your mouth. I repeat, your denial is false." (App. 291–92)

6. "Mr. Cohen: I respectfully ask for a mistrial, if your Honor please.

"The Court: Denied. Let the record show that yesterday afternoon, on the record, I pointed out that Mr. Cohen possibly inadvertently had given the jury the impression that this witness had been aware that he had the right to change any answer in the deposition, and that he didn't do it. And I said repeatedly to Mr. Cohen, you know full well that if the witness wasn't told about it he could not possibly have made any change.

I then turned to Mr. Danahar and I said, what about it? Did you tell Anderson that he could make any change he found necessary, or have it recorded? And he said, no. And he repeated it before you this morning.

I then said, yesterday afternoon, gentlemen, I think it best that you sit down, in fact, I direct you to sit down as lawyers should and go over the deposition and see what portions of the deposition you can agree on should be placed before the jury. They shouldn't be loaded down with things that aren't pertinent. In a deposition there is a lot of material sometimes that is not relevant.

Both of them promised they would do so. I then said, now, look, if there are portions that you disagree on I will have to resolve it. See what you can, however, agree upon.

You heard it. You were here. I made it clear to Mr. Cohen right in your presence that that was what the agreement was last night, and I was to be told this morning what portions they agreed on and what portions they didn't agree on.

Instead Mr. Cohen stands up and says, I want to put the whole deposition in evidence. Mr. Danahar said the whole thing shouldn't go into evidence, and I object to certain parts of it.

I then said, as the record will show, you should have first told me, Mr. Cohen, what you people had agreed on pursuant to my direction, and what you did not agree on. You don't suddenly ignore what the Judge said you were to do, and then say, I offer it in evidence. That can be done later.

Right now I want to know what they did with my direction, and I want to know what Mr. Danahar has to say with regard to any objections. Therefore I say it was totally unnecessary for Mr. Cohen to get up and make his last recapitulation of what was already clear. That is the status of the record.

I will excuse the jury and take up these questions of law. What did you want to say before the jury leaves?

"Mr. Cohen: I would like to say for the record that unfortunately I am placed in a position of confrontation with the Court which is, I believe, an unfortunate thing. A climate has been created in this courtroom where I cannot possibly properly represent the interests of my client. I regret very much it has come about, your Honor. We have known each other for a long time. I sincerely regret under all the circumstances I am really compelled to renew my motion for a mistrial. I don't think I can properly do justice for my client in this case.

"The Court: Very well, that is your opinion. I see no reason why a Judge should not have the right to say what he thinks, and I intend to say it as long as I draw a breath.

You may not like it, sir. I say again to you, that you were wrong." (App. 286–89).

as well as those that were inconsistent with this trial testimony, in order to "give this jury, the entire flavor of what transpired on the deposition so that they were able to make a judgment on his statement yesterday that he was nervous, or didn't understand," the following transpired:

"The Court: Isn't that what I said in substance yesterday?

"Mr. Cohen: Absolutely, your Honor, and I am trying to comply with your Honor's—

"The Court: No you didn't. You did not. I was the one who said ex-actly *what you are saying now.*

"Mr. Cohen: That's right, sir.

"The Court: And you are saying it as though you thought of it.

"Mr. Cohen: Oh, no. Judge, I don't mean to take pride of authorship in that, and I didn't say that.

"The Court: Now look, mister, I'm getting incensed. *First you bring along a ruffian into the courtroom.* I don't say that you conspired with him to have him behave the way he did in my sight. You are above that. But you did not comply with what I directed, and anybody who comes in here at 9:45 or 9:40 to do a job that I layed down is dead wrong and should never have allowed that to happen. There is no reason why this wasn't completed between you gentlemen last night.

If you wanted to let it go until this morning you should have given your-selves ample time to do it thoroughly. I am not supposed to pickup your mess, your oversights, your failures that you can detect as well as I. You have an obligation to the plaintiff and you have an obligation to the defend-ant and you have got to do everything right, not this come today, come to-morrow attitude.

The record shows that the way this was done is deplorable, and I regret that the Court got such short shrift at the hands of counsel on both sides.

Let the record further show that Mr. Cohen saw fit to say in front of the jury that he asked to come to see the Judge a minute or two before 10:00 o'clock, and I have already an-swered that and I would like to also add that when he asked permission to come to the side the very first thing he said, when I inquired what else is there, he didn't mention anything with regard to the deposition, as the record will show, and at the side bar I said, is there anything else, and he said, no, thank you." (Emphasis added) (App. 296–97).

Eventually, with the consent of plain-tiff's counsel, plaintiff's deposition was read in its entirety to the jury. How-ever, at the outset of the reading the court, rejecting a juror's offer to assist in the reading, remarked, "No, you are there to be sold a bill of goods." (App. 366). The court furthermore criticized the reading of the entire deposition in-stead of selected portions, stating, "we have to sit here and have a lot of this stuff read. Entirely unnecessary, and not helpful at all, but there it is when you don't listen to the Judge and try to figure out some other way." (App. 431). Defense counsel was criticized by the court for spending "an inordinate amount of time" in reading the deposi-tion and for eliciting from plaintiff a statement that the accident might have been caused by his slipping, since the dredge was in water.

On the issue of liability the defense offered testimony that shortly after the accident plaintiff had said the accident occurred when "the dredge lurched possi-bly because of a ground swell and he [plaintiff] was thrown over the drum, he [sic] left arm was caught in the cable and he wound around the drum and was tossed to the rear of it." Defendant fur-ther relied on plaintiff's pretrial deposi-tion testimony to the effect that he did not know how the accident occurred and could not say if he "slipped." The cap-tain of the dredge testified that follow-ing plaintiff's accident he completed the job plaintiff had been doing by operating

the winch alone, but in a manner somewhat different from that used by plaintiff. The captain stood to the right of the wire being hauled on to the drum, which placed him closer to the operating level and permitted him to keep his right hand on it at all times without leaning over the moving wire. Defendant then offered the testimony of a maritime expert on the operation of ship's winches to the effect that only one man was needed to operate a winch of the type in question, that the proper method was for the operator to stand to the right side of the drum and incoming wire cable so that no part of his body need bend over the cable, and that it is not good safety practice to stand (as had the plaintiff) on the left side, touch the moving cable, or bend over the moving cable to operate the winch lever.

There being no competent proof that the accident was caused by a "fish hook" on the wire cable, the court eventually granted defendant's motion to strike plaintiff's testimony in which he had speculated that his accident might have been caused by a "fish hook." At the close of the evidence plaintiff's position, therefore, was that the defendant should have supplied a three-man crew to operate the winch and relay signals and that he was forced to stand in a dangerous position to the left of the moving wire cable so that he could move to the door for signals without stepping over the moving cable. The defendant's contention in reply was that one man could have safely operated the winch by standing to the right of the cable with his hand constantly on the operating lever, turning off the winch and stepping over the inert cable when it was necessary to go to the cab door for signals, and that plaintiff had failed to show that an inadequate crew was the proximate cause of his accident.

The court delivered a lengthy charge (some 95 pages of the record) to the jury, to which defense counsel excepted on the ground that by tone, emphasis and repetition it favored plaintiff's position. When the jury, after deliberating during the evening until midnight, resumed on the following morning the court gave an Allen charge. Following further deliberations the jury requested and received from the court a summary of its charge on negligence and contributory negligence, to a part of which defense counsel excepted.

The jury finally rendered a verdict awarding the plaintiff $500,000 less 50%, or $250,000, due to plaintiff's contributory negligence. Defendant's motion pursuant to Rules 50(b) and 59, F.R.Civ.P., for judgment n.o.v. or, in the alternative, for a new trial were denied.

## DISCUSSION

■ Defendant concedes that liability may be predicated upon an inadequate or insufficient crew. Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967); American President Lines, Ltd. v. Welch, 377 F.2d 501 (9th Cir. 1967); American President Lines, Ltd. v. Redfern, 345 F.2d 629 (9th Cir. 1965). However it urges that, assuming *arguendo* the inadequacy of the crew in this case, there was no proof that it was the proximate cause of plaintiff's accident. We disagree. There was evidence which, viewed most favorably to plaintiff, would support an inference that with a larger crew the winch might have been turned off sooner or the plaintiff, had his duties been limited to guiding the spooling of the wire, would have been able to take greater precautions against being caught in the moving winch. Although there was contrary evidence, the issue was clearly one for the jury to resolve.

Defendant next contends that it was precluded from fully presenting its position and obtaining a fair trial by reason of the trial judge's open partiality to the plaintiff's claim, his hostility to the defense, and his erroneous rulings. Specifically defendant argues that (1) the court frequently took over the examination of witnesses to elicit testimony favorable to plaintiff and to dull the impact of proof that was helpful to the defendant, (2) made erroneous rulings that prevented

defense counsel from fully impeaching the plaintiff (e. g., the limitation on the use of plaintiff's pretrial deposition testimony), (3) demeaned and castigated defense counsel in the jury's presence, (4) engaged in other highly prejudicial conduct (e. g., the chastisement of Mr. Ardizzone in the jury's presence, leading to disclosure that he represented defendant's insurance carrier), and (5) instructed the jury in terms and tone that exceeded the bound of fair comment. Before considering these assignments of error a brief review of the judge's role in the conduct of a jury trial is advisable.

■■■ As we have frequently observed, the district judge, in conducting a criminal or civil trial, acts as more than a mere moderator or umpire. See United States v. Weiss, 491 F.2d 460 (2d Cir. 1974); United States v. Nazzaro, 472 F.2d 302 (2d Cir. 1973). His function is to set the tone of the proceedings and exercise sufficient control to insure that the trial will be an orderly one in which the jury will have the evidence clearly presented. See DiBello v. Rederi A/B Svenska Lloyd, 371 F.2d 559 (2d Cir. 1967). While participation by the trial judge in interrogation of witnesses may properly be done to clarify both legal and factual issues and thus minimize possible confusion in the jurors' minds, "such intervention should not become the rule," United States v. D'Anna, 450 F.2d 1201, 1206 (2d Cir. 1971), and must not be indulged in to the point where the atmosphere ceases to be one of "impartiality and detachment," Pariser v. City of New York, 146 F.2d 431, 433 (2d Cir. 1945).

"He must not . . . usurp the functions either of the jury or of the representatives of the parties and must take care not to give the jury an impression of partisanship on either side. United States v. Curcio, supra, 2 Cir., 279 F.2d [681] at page 685; United States v. Brandt, 2 Cir., 196 F.2d 653." United States v. DeSisto, 289 F.2d 833, 834 (2d Cir. 1961).

■■■ Ours remains an adversarial rather than an inquisitorial system, which depends heavily upon the functioning of legal counsel to elicit the evidence in a sequence and manner that will best enable him to fulfill his role as an advocate, provided the rules of evidence are observed. While a trial judge may understandably become impatient with counsel's examination of a witness, either because of its ineptness, lack of clarity or organization, or for some other reason, the judge must exercise self-restraint in his interference lest "clarification" only create more confusion or the impression in the jurors' minds that the judge is hostile to one party's position. In short the trial judge is called upon to perform the difficult task of maintaining a delicate balance between lack of control on the one hand, and over participation on the other. In such circumstances review is of course an unusually difficult and delicate task.

"As we have recently observed in United States v. Nazzaro, 472 F.2d 302 (2d Cir. 1973), the task upon appellate review of determining whether a judge's conduct has 'improperly . . . shifted the balance against a defendant' is a difficult one, especially since the printed record cannot convey the atmosphere, the tones of voice of judge, counsel and parties, and their facial expressions. See United States v. Boatner, 478 F.2d 737 (2d Cir. 1973). However, we are relegated to doing the best we can with the aid of the trial transcript, bearing in mind the substance or triviality of the various matters claimed to have been the subject of prejudicial conduct or remarks on the judge's part. Experience teaches that quotations lifted out of the transcript can often be unintentionally misleading, since they usually fail to give a true or complete picture of the framework for and background of the allegedly prejudicial comments. Counsel, being advocates, also tend to attach excessive significance to some remarks and to overlook counterbalancing portions of the record. For these reasons it is essential, at least where appellant's brief (as here) raises a substantial issue as to the trial

judge's fairness in conducting the trial, to make a 'close scrutiny of each tile in the mosaic.'" United States v. Weiss, 491 F.2d 460, 468 (2d Cir. 1974) (footnote omitted).

■ Applying these principles here, the district judge from time to time did engage in extensive questioning of witnesses, particularly the plaintiff, coupled with statements as to the purpose and relevance of certain proof. In most instances, however, he appears from the record to have been seeking solely to clarify the evidentiary picture for the benefit of the jury, without any apparent prejudice to the defendant other than that which would normally accrue from proof of facts that might tend to establish plaintiff's claim. At times, however, the court's questioning was unquestionably prejudicial to the defendant. For instance its exploration at length into plaintiff's "belief" that the accident had been caused by his gloved hand being caught on a "fish hook" was unfortunate for the reason that the testimony turned out to be mere speculation as plaintiff never did establish the existence of any such defect, which would have furnished strong support for his unseaworthiness claim. Defendant understandably maintains that, notwithstanding the court's later striking of this testimony, continuing prejudice resulted from this questioning. Especially since the court, in its later charge to the jury, reminded the jury of the "fish hook" testimony and instructed that if plaintiff had been inclined to falsify his testimony he could have "insisted that it [the "fish hook"] was actually there." This reference might better have been left unsaid, since the jurors might after being reminded of it have themselves concluded that the accident was caused by a "fish hook." However, we must, in the absence of any further showing, assume that the jury abided by the court's ruling.

■ The defendant suffered more serious prejudice when its counsel sought to impeach the plaintiff through use of his pretrial deposition and to inquire as to his failure to correct deposition testimony asserted on cross-examination to have been incorrect. Had the matter stopped at this point, the interplay between court and defense counsel would probably not have been sufficiently prejudicial to call for a new trial. However, from this point on the record reveals the development and display of a measure of hostility on the part of the court toward defense counsel, accompanied by questioning of plaintiff by the judge that might be construed as protective rather than as merely investigative in nature (e. g., bringing out plaintiff's "nervousness" when he was deposed). The hostility continued with the court taking over the examination of the plaintiff and advising defense counsel in the jury's presence that he was "wrong" in seeking to elicit from plaintiff that he had not sought to correct his pretrial testimony. Then came the scenes in which the court stated that plaintiff had not been advised regarding his right to make corrections, its advice to the jury that this had been confirmed by plaintiff's counsel (even though the latter had not been examined under oath) and the Ardizzone incident in which the jury learned that defendant was insured.

In our view this series of courtroom exchanges and rulings were seriously prejudicial to the defendant. The credibility of the plaintiff, as the sole witness to the accident, regarding the manner in which it occurred was of crucial importance. This was later reflected by the jury's difficulty in reaching a verdict, which was rendered only after a series of inquiries by it of the court, leading to supplemental charges, including an Allen charge.

It is true that the district court sought to remedy some of the confusion and prejudice by instructing the jury at length regarding the procedure required by the federal rules to be followed by a witness in correcting deposition testimony. However, these instructions, while technically correct, precluded the defense from ascertaining whether plaintiff

 

called the errors to anyone's attention and unduly magnified the procedural problem confronted by a witness seeking to correct his deposition testimony. In practice the procedure is relatively simple. The witness simply notes his correction and the reason for it in a word or two in the margin before signing and swearing to the transcript.

The important point for present purposes is that defense counsel should have been accorded the opportunity, without interference by the court, to explore this most important matter with the witness, bringing out for the jury's benefit what the plaintiff had done when he discovered what he knew to be material errors in his deposition testimony and whether he had asked anyone if he might correct them. If this traditional procedure had been followed, plaintiff's counsel would then have had the chance, in turn, to rehabilitate the witness by eliciting any circumstances, including his lack of knowledge or understanding of correction procedures, that would explain his failure to rectify his answers. This is the essence of the adversarial system and the function of trial counsel, both of whom in this case were experienced and not lacking in the skills required for adequate representation of clients in the trial of a civil action for damages for personal injuries.

Viewing the record as a whole we are persuaded that the cumulative effect of the court's statements and rulings, including portions of its instructions to the jury,[7] however well-intended, had a sufficiently prejudicial effect to require that the judgment be reversed and re-

manded for a new trial before another judge. We accordingly see no need to reach appellant's third contention concerning the size of the damage award.

---

7. Portions of the charge could be construed as leaning in favor of plaintiff's claims. For instance, in lengthy instructions on the subject of damages the court stated:

"Do you believe him when he says he can't hold his baby in his left arm? If you do, is that a matter of difference? Is his earning power the only thing that counts in life? Or is it the ability to hold a baby in your left arm? If it's true, and if you believe it. Is it true that he can't play pool? If you believe it, what is that worth?

"You may want to read books, play golf, work in a laboratory, be a teacher. He wants to play pool. Nothing wrong with that; if you believe him to be deprived of that privilege. The law says it is a matter up to you.

"Now, there are varying degrees of pain and suffering. The plaintiff contends that the proof warrants your finding that he is now and always will be experiencing substantial periods of pain; that in his case there are few compensatory physical functions upon which he can rely so that life can have its former zest and satisfaction." (App. 907–08).