Jose Luis RIVAS, Plaintiff–Appellee,

v.

Matteo BRATTESANI (Shield No. 14412) and Joseph Romano (Shield No. 05691), Defendants–Appellants.

No. 1745, Docket 95–9270.

United States Court of Appeals, Second Circuit.

Argued July 16, 1996.

Decided Sept. 4, 1996.

---

Margaret G. King, New York City (Paul A. Crotty, Leonard Koerner, Corporation Counsel's Office, City of New York, of counsel), for defendants-appellants.

James M. Mimnaugh, Reardon & Sclafani, New York City, for plaintiff-appellee.

Before: WINTER and CABRANES, Circuit Judges, and MOTLEY, District Judge.*

PER CURIAM:

Defendant police officers Matteo Brattesani and Joseph Romano (jointly "the Officers") appeal from a judgment entered on November 8, 1995, by the United States District Court for the Southern District of New York (Kevin Thomas Duffy, *Judge* ) for com-

pensatory damages in the amount of $20,000 against both defendants, jointly and severally, and for punitive damages in the amount of $25,000 against each defendant separately. On appeal, defendants claim that the district court denied them a fair trial. We are persuaded that comments made by the court in the presence of the jury may have given the jury the impression that the court had formed a distinctly negative opinion of defendants, their counsel, and their evidence, impairing the fairness of the trial in a way that no jury instruction could cure. Accordingly, we vacate the judgment and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

This action against the City of New York (the "City") and the Officers was begun on April 3, 1992. Plaintiff alleged that on March 7, 1992, at approximately 10:00 p.m., while at a Chinese restaurant in the Washington Heights section of Manhattan, the Officers, together with two other unknown police officers, assaulted and beat him. Pursuant to 42 U.S.C. § 1983 ("Section 1983"), plaintiff claimed that both the City and the police officers deprived him of rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States, and sought compensatory and punitive damages from the police officers. In their answer, defendants maintained that they acted in good faith and in accordance with the United States Constitution and the laws of New York, and that any injuries sustained by plaintiff were caused by his culpable conduct.

Upon agreement of the parties, the district court bifurcated the case, trying the claims against the Officers for assault and battery separately from the claims against the City. This appeal is from the judgment entered after a jury returned a verdict against the Officers.

The trial began on June 26, 1995. During defendants' opening argument, the judge interrupted and reprimanded one of the two

* The Honorable Constance Baker Motley of the United States District Court for the Southern District of New York, sitting by designation.

trial counsel for defendants (who was trying his first federal trial), for stating during his opening that "the evidence in this case will show that the promises that [plaintiff's attorney] made to you will not come true.... I personally promise you, though I have no burden of proof in this matter, there will be no evidence ... these officers did anything wrong." As defense counsel continued summarizing the evidence to be presented, the court asked counsel, "Is this an opening?" and abruptly announced, "You are finished. Sit down." After the jury was excused for lunch, the court informed the offending attorney's co-counsel that by "personally promis[ing] ... that a certain result would be achieved ... he has disqualified himself in this case.... I assume you will be ready to try the rest of the case."

At the conclusion of the lunch recess, defense counsel asked the court to reconsider the disqualification of her co-counsel and proposed that the court give the jury a curative instruction to the effect that the opening statement "was not testimony." The court ordered a mistrial instead, on condition that defense counsel personally pay the costs of impanelling the jury. The court, noting that the one thing a lawyer can prepare in full in advance of trial is an opening statement, said, "This was not prepared. This was an off-the-cuff kind of hodge-podge of ideas, boom, lets slam him, let's do this [sic], let me testify and so on and so forth. It's a horror." When the court was informed that the opening statement had indeed been prepared in advance, the court responded, "That was a prepared opening statement? Then he ought to be disbarred." After the court warned that, "by God if he does it again he will end up in the slammer," the court permitted both defense counsel to try the case in a new trial that began, with the same attorneys, but before a new jury, on the next day.

At trial, Rivas' account of his encounter with the Officers differed dramatically from the account of the Officers. According to Rivas, he and a friend were at a restaurant on the corner of Sickle and Nagle Streets, and, as the friend was ordering food, Brattesani, in street clothes, came into the restaurant and, without provocation, punched Rivas

in the face. The officer, together with Romano and an unknown officer, allegedly continued to beat Rivas.

Rivas testified that he thereafter went to the police precinct at about 11:00 p.m., where he filed a complaint against the Officers. Despite instructions on the official complaint form stating "Prepare this report in your own handwriting. You will immediately receive a typewritten copy as your receipt," Rivas was told to come back in an hour and a half to receive a typewritten copy of his complaint, which he testified that he did. He further testified that several hours after the beating he went to an emergency room for treatment.

The Officers told an altogether different story of their encounter with Rivas on March 7, 1992, denying, among other things, that they entered the restaurant that night, or assaulted or beat anyone. They testified that they were both assigned that night to the Anti–Crime Unit of the 34th precinct ("the precinct"), and that, as such, they worked together until 11:05 p.m. in plain clothes and drove in an unmarked car while on the lookout for suspicious activity. Brattesani testified that the only contact he had with Rivas was at about 10:00 p.m., when he spotted Rivas and another man on the corner of Nagle and Sickle Streets. The officer testified that Rivas had a bulge to the right of his waist and that the other man had a bulge in his jacket pocket. Believing that the bulges were firearms, the Officers performed a routine "stop and frisk". According to Brattesani, after he determined that the bulges were not firearms, he asked both men for their names and other personal data, which he wrote down in his memo book as soon as he returned to his car and used later that night at the precinct—at some time between 10:00 p.m. and his check-out time of 11:05 p.m.—to fill out the required "Stop, Question and Frisk" reports (the "SQF reports"). During cross-examination, Brattesani denied that upon returning to the precinct anyone had informed him that Rivas had just filed a civilian complaint report against him. He also denied fabricating the SQF reports or copying Rivas' name from the civilian

complaint report and also denied inventing a name for the man accompanying Rivas.

■ Appellants have identified numerous comments made by the court during the course of the trial which, in their view, deprived them of a fair trial. Because many of those comments "were not made before the trier of fact and therefore did not affect the fairness of the trial," *Zinman v. Black & Decker (U.S.), Inc.,* 983 F.2d 431, 436 (2d Cir.1993),[1] and many others appear "solely to clarify the evidentiary picture for the jury, without any apparent prejudice to the defendant," *Anderson v. Great Lakes Dredge & Dock Co.,* 509 F.2d 1119, 1132 (2d Cir.1974), we limit our discussion to three exchanges involving the court which we consider relevant to the issue before us. These occurred during (1) the cross-examination of Dr. Robert Fogel, plaintiff's expert witness on damages; (2) the voir dire examination of Dr. Dominick J. DeMaio, defendants' expert on damages; and (3) the cross-examination of Brattesani. We note that since plaintiff and defendants told such sharply divergent stories about their encounter, the court's statements in the presence of the jury assumed more than their usual importance. *Cf. id.* at 1121.

A. *Cross-examination of Dr. Robert Fogel*

During the cross-examination of Dr. Robert Fogel, plaintiff's expert witness on damages, defense counsel questioned the witness extensively about whether he had "a lien against [plaintiff's attorney, Mr. Jim] Mimnaugh," for payment of his medical bills. This line of questioning was interrupted with questions from the court and objections from plaintiff's counsel. At one point. the court, in apparent exasperation with defense counsel, said, "Come off it, will you counsel" and then, addressing the jury, said, "That, by the way, ladies and gentlemen, is pretty silly." It is

not disputed that the instruction to "[c]ome off it" was directed at defendants' counsel and that the comment to the jury that the questioning was "pretty silly" was a comment on defense counsel's line of questioning. At another point in the cross-examination of Dr. Fogel, the court remarked in the presence of the jury that defense counsel's line of questioning (regarding Dr. Fogel's experience in treating club feet) was "goofy."

B. *Examination of Dr. Dominick J. DeMaio*

Later in the trial, defendants sought to have Dr. Dominick J. DeMaio, a licensed pathologist and specialist in forensic medicine and former New York City chief medical examiner, give testimony on damages based upon his review of plaintiff's medical records.

During the voir dire examination of Dr. DeMaio by plaintiff's counsel the following exchange took place:

Q. Did you ever examine Mr. Jose Rivas?

A. No, I did not.

Q. Did you ever have a practice where your practice involved treating living people?

A. No. I examined living people. I don't treat them.

MR MIMNAUGH: I would move not to have Dr. DeMaio testify.

THE COURT: [His testimony is] being restricted only to reading the reports I gather.

*You never did an autopsy on a person without ever seeing the body, did you?*

THE WITNESS: I didn't do any autopsy here.

THE COURT: No, not here. *Did you ever do an autopsy without seeing the body?*

---

1. At one point during the second trial, the judge referred to defense counsel as a "junkyard dog" whom the Corporation Counsel had "hire[d] ... and let ... loose." This statement was made outside the presence of the jury, but we are bound to state our disapproval of such personally abusive comments directed at a participant in a trial. Such comments are never appropriate or

necessary for the effective exercise of judicial authority and they unavoidably cast doubt on the court's impartiality. We have taken into account the comments of the court to defense counsel in the absence of the jury during both of these trials only in deciding to direct that this case be assigned to a different judge upon remand.

THE WITNESS: An autopsy without seeing the body?

THE COURT: Yes. You can't do it, right?

THE WITNESS: I can review a report but I can't do an autopsy.

THE COURT: Okay. He is here to talk about reviewing reports. That is all.

(Emphasis added.)

### C. *Cross-examination of Brattesani*

During cross-examination of Brattesani, counsel for Rivas sought to ascertain the source of the information contained in the SQF reports, but Brattesani could not remember whether the two suspects had furnished identifying documents, or had simply given the information orally in response to his questions. The following exchange then took place in the presence of the jury:

A. I believe I was writing down the stuff, the information and stuff, the pedigree information, the name and address and all.

Q. Where were you writing that down?

A. Where?

Q. Yes, where.

A. It could have been anything. I used to use Dunkin' Donut[s] napkins, anything I had available.

Q. Do you still have the writing material that you used that night to write down the information?

A. No.

THE COURT: I am sorry, you are a police officer, aren't you?

THE WITNESS: Yes, sir, I am.

THE COURT: You have a memo book. You are required to carry it, aren't you?

THE WITNESS: I do carry it.

THE COURT: And the reason for that memo book is for you to write down things, isn't it?

THE WITNESS: Yes, sir, but the thing is—

THE COURT: And instead of writing in the memo book you record things on Dunkin' Donuts[ ] napkins, is that correct, sir?

THE WITNESS: That is correct, your Honor.

THE COURT: *So that your memo book becomes a fraud that you make up at the end of the day?*

[DEFENSE COUNSEL]: Objection.

THE COURT: All right.

[DEFENSE COUNSEL]: Objection to the characterization by the court, your Honor.

THE COURT: Is the memo book made up at the end of the day?

THE WITNESS: No, your Honor, it's made up right after I get back into the car.

THE COURT: You stated on direct examination [that "]as the recorder I make notes on [ ]whatever paper is available." You had your memo book then, didn't you?

THE WITNESS: Sir, my memo book was in the car. I didn't have it in my pocket or on my person.

(Emphasis added.)

Shortly thereafter, defendants moved for a mistrial, claiming that the court's characterization of Brattesani's memo book as "a fraud that you make up at the end of the day" was prejudicial, and so prejudicial that no jury instruction could cure the error. The court denied the motion and the trial proceeded.

Following the final arguments of counsel, the district court included the following statements in his instructions to the jury:

You should not seek to draw any inference from any actions of mine. At times I may have admonished a witness or directed them to be responsive to questions. At other times I questioned witnesses myself. Any questions I may have had and any instructions I have given to you in connection therewith are intended only to clarify the presentation of the evidence. You are to draw no inference whatsoever, either favorable or adverse to any party or any witness, by reason of anything I said or did which leads you to infer that I have any view as to the credibility of any of the witnesses or of the weight of any evidence or how you are to decide any factual issue in this case.

I asked some questions of Officer Brattesani and about his memo book. Counsel

believes that you might take from these questions an indication of my belief or opinion as to Brattesani's credibility. I want to make sure that you recognize that my opinions and beliefs are of absolutely no import to you. These are matters for your exclusive determination. Just as I am the sole judge of the law in this case, you are the sole judge of the facts.

Following a jury verdict in favor of plaintiff, defense counsel moved for judgment notwithstanding the verdict and/or for a new trial. The district court denied the motion and entered final judgment for plaintiff on November 8, 1995. This appeal followed.

## II. DISCUSSION

On appeal, defendants-appellants contend that the trial was fundamentally unfair and ask this court to order a new trial before a different judge.

■ Before considering the merits of appellants' contentions, a brief review of a judge's proper role in the conduct of a jury trial may be helpful. It is, of course, the rule that a motion for a new trial must be granted if the trial was not fair to the moving party. *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). We review the district court's denial of a new trial for abuse of discretion. *Blissett v. Coughlin,* 66 F.3d 531, 535 (2d Cir. 1995).

Although we have had many occasions to observe that due process requires a fair trial rather than a perfect trial, *see, e.g., Ricketts v. City of Hartford,* 74 F.3d 1397, 1416 (2d Cir.1996); *see also, McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984); *cf. Ross v. Oklahoma,* 487 U.S. 81, 91, 108 S.Ct. 2273, 2280, 101 L.Ed.2d 80 (1988) (criminal case), we have also noted that "a court must strive for 'that atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding,'" *Santa Maria v. Metro-North Commuter R.R.,* 81 F.3d 265, 273 (2d Cir.1996) (quoting *Glasser v. United States,* 315 U.S. 60, 82, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942)).

■ We are mindful that a district judge is entitled to ask questions during a trial and that he "acts as more than a mere moderator or umpire." *Zinman v. Black & Decker (U.S.), Inc.,* 983 F.2d 431, 436 (2d Cir.1993) (internal quotation marks omitted). Because the judge's role is " 'to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert,' " *Care Travel Co., Ltd. v. Pan Am. World Airways, Inc.,* 944 F.2d 983, 991 (2d Cir. 1991) (quoting *United States v. Marzano,* 149 F.2d 923, 925 (2d Cir.1945) (L. Hand, J.)), the judge may ask questions of witnesses "to clarify both legal and factual issues and thus minimize possible confusion in the jurors' minds." *Id.* at 991 (internal quotation marks omitted); *see also* FED. R. EVID. 614(b) ("The Court may interrogate witnesses...."); *Berkovich v. Hicks,* 922 F.2d 1018, 1025 (2d Cir.1991). Those questions, however, "may not ... convey the court's view about the merits of a party's claim," *Berkovich,* 922 F.2d at 1025, inasmuch as the judge "may not impose his own opinions on the jury." *Care Travel Co.,* 944 F.2d at 991. We have observed that

> [w]hile a trial judge may understandably become impatient with counsel's examination of a witness, either because of its ineptness, lack of clarity or organization, or for some other reason, the judge must exercise self-restraint in his interference lest "clarification" only create more confusion or *the impression in the juror's minds that the judge is hostile to one party's position.*

*Anderson,* 509 F.2d at 1131 (emphasis added).

■ In the instant case, after reviewing the record as a whole, we are left with the firm conviction that, by its comments, however well intended, the district court conveyed to the jury the impression that it held a fixed and unfavorable opinion of defendants, their counsel, and their position.

Although the court's statement—"That by the way ... is pretty silly"—may have been intended as an innocent observation of what the judge perceived to be an illogical question, the jury could have understood it to be

the judge's expression of a distinctly negative opinion of defendants' counsel.

Likewise, the court's question to Dr. De-Maio—"Did you ever do an autopsy without seeing the body?"—may have given the jurors the impression that the court was skeptical as to Dr. DeMaio's fitness as an expert in this case.

Finally, the court's question directed at Brattesani—"So that your memo book becomes a fraud that you make up at the end of the day?"—was likely to have conveyed to the jury the idea that the court doubted the existence of a legitimate memo book or seriously questioned Brattesani's credibility. Our view in this regard is particularly influenced by the fact that in this case, due to the sharply conflicting testimony of plaintiff and defendants, the court's use of the word "fraud" in his questioning of Brattesani was potentially fatal to defendants' case.

We cannot agree with appellee's contention that any prejudice that may have resulted from the district court's comments was cured by the court's instruction to the jurors. No curative instruction, in our view, could undo the cumulative prejudicial effect of the court's various inappropriate comments in the presence of the jury. *Cf. United States v. Filani*, 74 F.3d 378, 386 (2d Cir.1996) (in criminal case, noting that "[c]urative instructions to the jury, to the effect that they can decide what version to believe as sole judges of credibility, do not remove . . . an impression [that the judge believes one version of an event and not another] once it is created.").

We conclude that the cumulative impact of the district court's comments in the presence of the jury resulted in an unfair trial and requires that we vacate the judgment and order a new trial. Because the judge's impartiality has been seriously called into question by his comments in front of the jury, as well as by his especially hostile comments to defendants' counsel outside the presence of the jury,[2] plaintiffs are entitled to a new trial before a different judge. *See, e.g., United States v. Microsoft*, 56 F.3d 1448, 1463 (D.C.Cir.1995) (per curiam).

2. *See supra* note 1.

## CONCLUSION

For the reasons stated above, the judgment of the district court is vacated and the cause is remanded for a new trial before a different district judge.