**UNITED STATES of America,**
**Appellee–Cross–Appellant,**

v.

**William GREER, a/k/a Thomas Williams Dodds, and Stephen Brent Hutchins, Defendants–Appellants–Cross–Appellees.**

**Docket Nos. 99–1072(L), 99–1073(CON) and 99–1092(XAP).**

United States Court of Appeals, Second Circuit.

Argued March 23, 2000.

Decided Aug. 14, 2000.

Amended March 7, 2002.

David V. Kirby, Then–Acting United States Attorney for the District of Vermont (Gary G. Shattuck, Assistant United States Attorney, on the brief), Burlington, VT, for Appellee–Cross–Appellant.

Edward S. Zas, Federal Defender Division Appeals Bureau, Legal Aid Society, New York, NY, for Defendant–Appellant–Cross–Appellee William Greer.

Mark A. Kaplan, Burlington, VT, for Defendant–Appellant–Cross–Appellee Stephen Brent Hutchins.

Before: FEINBERG, JACOBS, and STRAUB, Circuit Judges.

STRAUB, Circuit Judge.

William Greer and Stephen Brent Hutchins appeal from judgments of conviction entered on January 27, 1999, following a jury trial in the United States District Court for the District of Vermont (William K. Sessions, III, *Judge* ). Greer was convicted of conspiracy to import and export hashish and marijuana, violations of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. app. § 1903, and failure to file a currency transaction report, and was sentenced principally to a term of imprisonment of 324 months. Hutchins was convicted of conspiracy to import and export hashish and marijuana and violations of the MDLEA, and was sentenced principally to a term of imprisonment of 276 months. The United States cross-appeals from the sentences imposed.

On appeal, Greer and Hutchins raise several challenges to their convictions. First, they contend that the District Court committed reversible error by excluding the parties and counsel from *in camera* meetings with prospective jurors to discuss jury service hardship excuses. Second, they assert that the court further erred by failing to disclose to the parties and counsel that one prospective juror attempted to discuss issues unrelated to hardship during his *in camera* meeting. Third, they argue that a new trial was required because a juror failed honestly to answer material questions on *voir dire* and because that juror and others had been exposed to extrinsic evidence. Fourth, the defendants contend that the District Court improperly instructed the jury that a foreign nation's consent to enforcement of United States law, even if provided after indictment, satisfies the jurisdictional element of the MDLEA. Fifth, the defendants assert that the District Court erred by failing to state its reasons for imposing their sentences at a particular point within a United States Sentencing Guidelines ("U.S.S.G.") range that exceeded 24 months, as required by 18 U.S.C. § 3553(c)(1). Finally, Hutchins argues that his $500,000 fine was clearly erroneous.

In its cross-appeal, the government challenges the sentences imposed by the District Court on three grounds. First, the government contends that the District Court erred in excluding from defendants' relevant conduct, under U.S.S.G. § 1B1.3, a quantity of drugs that was part of the defendants' offense but that was not intended for distribution in the United States and had already been the subject of foreign prosecution. Second, the government argues that the District Court erroneously found the defendants to be only managers or supervisors rather than leaders or organizers of criminal activity pursuant to U.S.S.G. § 3B1.1. Finally, the government asserts that the District Court erred in refusing to impose a sentencing enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

As explained below, we conclude that the District Court did not err by excluding the parties and counsel from *in camera* meetings with prospective jurors to discuss jury service hardship excuses and by not disclosing particular remarks made by one prospective juror during such an *in camera* meeting. We further hold that the District Court did not exceed its allowable discretion in denying defendants' motion for a new trial.

Next, we conclude that the District Court properly instructed the jury that a foreign nation's consent to enforcement of United States law provided any time before trial satisfies the jurisdictional element of the MDLEA. We also hold that the fine imposed on Hutchins was not clearly erroneous and that the District Court did not err in concluding that the defendants were only managers or super-

visors rather than leaders or organizers of criminal activity.

We find, however, that because the District Court's sentencing remarks are ambiguous, we are unable to determine from the record whether the court was required to state its reasons for the defendants' sentences under 18 U.S.C. § 3553(c). We thus remand for clarification. We also hold that the District Court erred by sentencing Greer to 120 months' imprisonment for violating the currency reporting requirement of 31 U.S.C. § 5316(a)(1)(A), by excluding from relevant conduct a quantity of drugs that was part of the defendants' offense, and by applying the wrong standard in evaluating statements under the U.S.S.G.'s obstruction of justice provision. We thus remand for resentencing, but note that the defendants must be resentenced in accord with *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *United States v. Thomas,* 274 F.3d 655 (2d Cir.2001).[1]

Accordingly, we affirm in part, vacate in part, and remand for clarification of the record and for resentencing.

## BACKGROUND

This appeal arises out of an international drug smuggling and distribution conspiracy that spanned several decades and included the shipment of tons of hashish and marijuana to North America. The defendants, William Greer and Stephen Brent Hutchins, were prosecuted and convicted for their participation in that conspiracy. We recount only the events and circumstances that bear upon the parties' claims and that provide essential context.

The evidence presented at trial, taken in the light most favorable to the government, showed the following. The conspiracy was organized and headed by Dutch and Canadian organizations, which shared in the profits and directed the operations. Greer and Hutchins were hired to assist in the smuggling ventures. From 1980 to 1993, Greer and Hutchins conspired to import and export thousands of pounds of hashish and marijuana across the Vermont Canada border. The defendants, and associates whom they oversaw, transported drugs using backpacks, snowmobiles, boats, all-terrain vehicles, and airplanes. From 1989 to 1991, the defendants also participated in or planned the offloads of many tons of hashish from vessels in the St. Lawrence River into Canada and the United States. In 1991, one such offload attempt went awry—barrels of hashish were discovered floating in the St. Lawrence River after bad weather and an equipment malfunction foiled the smugglers' efforts—and the defendants were eventually arrested. Greer and Hutchins were prosecuted in Canada for drug offenses in connection with the failed offload.

In July 1996, a nine-count Superseding Indictment was filed against Greer and Hutchins in the United States, and the defendants went to trial in the District of Vermont in early 1997. At the close of trial, Greer and Hutchins were each convicted of one count of conspiring to import and export a controlled substance in violation of 21 U.S.C. §§ 952, 953, 960, and 963, and one count of conspiring to distribute and possess with intent to distribute hashish on board a vessel subject to the jurisdiction of the United States, in violation of the MDLEA, 46 U.S.C. app. § 1903. Greer was also convicted of one count of failing to report the international transportation of currency in violation of 31 U.S.C.

---

**1.** After our initial disposition in this case, *see United States v. Greer,* 223 F.3d 41 (2d Cir. 2000), the defendants' moved for rehearing.

In a separate order issued with this amended opinion we grant the defendants' motion for rehearing and deny oral argument.

§§ 5316(a)(1)(A) and 5322(b). The jury acquitted the defendants of the remaining counts, which are not relevant to this appeal. The District Court sentenced Greer to 324 months' imprisonment and Hutchins to 276 months' imprisonment. They timely filed notices of appeal.

## DISCUSSION

### I. *The Jury Issues*

Prior to jury selection, each venire person completed a jury questionnaire, which asked, *inter alia,* whether the potential juror, a relative, or a person close to that juror had ever been a victim of a crime, a witness to a crime, or accused of a crime. Prospective juror John Baker answered "no" to this question.

Then, prior to announcing the case to the jury panel, the District Court described the possible length of the trial and permitted those jurors with extraordinary personal circumstances and potential scheduling conflicts to address those issues individually in chambers. Neither the parties nor counsel were permitted to participate or observe. According to the court, this was standard procedure.

Defense counsel objected to their exclusion from the meetings. The court responded, however, that the purpose of the meetings was solely to discuss requests for excusal unrelated to the prospective jurors' knowledge of the case. Defense counsel asked what the court would do if a prospective juror mentioned something about the case. The court responded, "[T]hat is not to be addressed at all. That person is to be sent back, and that will be addressed with lawyers. I'm not going to say anything about this case." The court also noted that a court reporter would be present, though the reporter would likely not have a transcript of the meetings prepared before jury selection.

The court then met with approximately 30 jurors individually in chambers. The following colloquy took place between the court and juror John Baker:

BAKER: Your Honor, good afternoon. When you extended the invitation to meet with you privately, I was under the impression that it would have been privately. What I wanted to discuss with you is critical.

THE COURT: What—to excuse you as a juror?

BAKER: I wasn't asking for an excusal.

THE COURT: Oh.

BAKER: But what I have to say is critical.

THE COURT: There is a record that has to be kept of any communication.

BAKER: I can repeat it later.

THE COURT: Yes.

BAKER: I have no problem with that. I want your opinion of something.

THE COURT: Well, why don't you just tell me the general subject matter of the—

BAKER: Well, I can't ask you what trial, what case, and I understand that, but I can tell you probably what the case is.

THE COURT: Well, this—the purpose of this hearing, though, is just to get into discussion about whether people have personal problems with the six weeks to two months [length of the trial].

BAKER: No. I have no problem and I am not trying to get out of the trial.

THE COURT: All right.

BAKER: I am just—I wanted to be afforded an opportunity to talk to you in private, to assure myself that I'm not wasting my time, I am not wasting your time, going through the selection process, and then something comes

out during trial that maybe I shouldn't have been a juror.

THE COURT: Okay. Well, let's take this step by step. If you have got no problems with the period of time, let's have you come back at one o'clock and see if you are selected in the 35 jurors in the box there, and if you are, you will know—the nature of the case will be disclosed to you, and if you have any particular issues to resolve at that particular point, then we will take that step by step and you can bring that out.

BAKER: Fair enough.

THE COURT: All right?

BAKER: Thank you, sir.

THE COURT: Great. Thanks.

After the *in camera* discussions, the court informed counsel that during the interviews "nobody spoke about the case at all."

At *voir dire*, Baker was the first juror questioned. The court asked the jurors, beginning with Baker, to name "the sources from which [they] have some exposure to the facts of this case." The court explained that it wished to make sure that if a juror had "been exposed to some knowledge about this case, whether it's correct or incorrect, that that would not affect [his or her] judgment in any way."

Baker responded that he had heard about the case through a newspaper called the "Free Press." The court asked, "[I]s that strictly from the Free Press?"; Baker said yes. The court then asked Baker if he could nonetheless decide the case based only on the evidence elicited in court; Baker said yes. After questioning all the prospective jurors, the court again asked whether anyone "has been exposed to any kind of publicity or in fact has talked about this case with anyone else at all, who has

not addressed that already[.]" No juror responded.

Later during *voir dire*, Baker raised some concerns about possibly knowing several potential witnesses. Baker also noted, in response to the court's question about whether any prospective juror had prior experience with law enforcement, that as part of his National Guard duty he had searched vehicles at the Canadian border. Baker assured the court that he could remain impartial, however, and he was not dismissed.

The court also asked the jurors: "Have you had any experience involving yourself, any members of your family, or any close friend that relates to the use or possession of illegal drugs or narcotics, within the past 10 years?" Juror Baker did not respond. Upon returning to court the next day, however, Baker said that he had recalled that his best friend had died as a result of drug and alcohol abuse.

After some members of the panel had been dismissed, the court seated and questioned new potential jurors. In the presence of juror Baker, one new prospective juror informed the court that he had been asked by a co-worker who knew one of the defendants to lend a "sympathetic ear" to the defendants. The court asked the juror if this incident would make it uncomfortable for him to sit on the jury and whether the co-worker imparted any facts of the case to him. The juror answered no, and the court moved on. The juror was not challenged for cause, but ultimately was not needed on the jury because all the seats were filled. Baker was selected as a juror.

As part of its case during trial, the government attempted to establish a pattern of drug distribution by Greer dating back to 1980. One witness who testified in this regard, Michael Johnson, described situations in which Greer distributed drugs

to others. Johnson testified that Greer distributed drugs to a Robert Baker. Robert Baker's name came up more than once during Johnson's testimony.

Although juror John Baker did not reveal his relationship to Robert Baker during the trial, John Baker informed a news reporter after the trial that Robert Baker was his brother. The court then held a full evidentiary hearing to address this issue. At the post-trial hearing, John Baker testified that he was "surprised" to hear his brother's name during trial. He did not bring the relationship to the court's attention, however, because "it didn't have any impact" on him and because he believed that the relationship would not prevent him from being impartial. Baker testified that he mentioned his relationship with Robert Baker to at least two jurors, though he did not tell any juror that his brother was a drug user or purchaser. Baker also testified that he did not state during *voir dire* that his brother was involved with drugs because he did not know of any such involvement within the past ten years. The court then asked Baker if his relationship with his brother impacted his ability to be fair and impartial; Baker said no.

Baker acknowledged that his response on the jury questionnaire that no relative had been accused of a crime was inaccurate because his brother Robert had been convicted of a crime. Robert Baker had been incarcerated in 1969 and was jailed at least once after that. John Baker said that he did not reveal this on the jury questionnaire because he "didn't even give it a thought." According to John, he and Robert did not regularly associate with one another. John acknowledged, however, that he and Robert attended a family function during the trial.

Baker then testified that when he met with the court *in camera* prior to jury selection and said that he "probably" knew what the case was, he was referring to the case against Greer. The "critical" information he wanted to disclose was that prior to jury selection he had been contacted [2] by an old acquaintance who knew that Baker might serve as a juror for Greer's prosecution. The acquaintance said that Greer had not sent him, but that he was a "close friend" of Greer and wanted to make sure that there would be a "sympathetic ear" on the jury. Baker interpreted this contact as a bribe attempt. He responded that the contact was "inappropriate" and the offer "illegal." He then told the individual that he "ought [to] kick his ass for even suggesting [a bribe], if that's what he was suggesting."

According to Baker, he did not notify the court of the contact after the *in camera* meeting because, again, he believed that it would not affect his ability to be impartial. Moreover, after having seen that another juror was not immediately dismissed upon revealing a similar outside contact, Baker figured that "that solved [his] problem." The court asked Baker if the outside contact had "any bearing on [his] ability to be fair and impartial[.]" Baker responded, "Obviously not."

The court also interviewed the other jurors to determine whether they had been exposed to extrinsic evidence and to assess their ability to be fair and impartial. Five jurors recalled hearing John Baker mention his relationship to Robert Baker, and five jurors recalled that he described his contact from an outside source. One juror testified that John Baker told some jurors

---

**2.** It is unclear whether the contact was telephonic or in person. Baker first stated that he was "contacted," then later commented,

"We kind of met, like secretly. He didn't want to meet in a public place."

that Michael Johnson's testimony "should be thrown out." Another juror testified that John Baker announced before many jurors that his brother Robert was involved in drug transactions with Greer. According to this juror's testimony, Baker told the jurors that "Robert Baker was his brother, and that he was involved in drugs, that he was in and out of jail most of his life, and that he had dealt with Bill Greer." Baker, according to this juror, also told the jurors that the court was aware of the situation and had advised him that it "would cross that bridge when [it] came to it." The District Court, however, found this juror's testimony "not . . . persuasive."

None of the other jurors reported hearing John Baker's statements about Robert's drug transactions with Greer, and six jurors said that they had not even heard that John and Robert Baker were brothers. All twelve jurors affirmed that nothing they heard had an impact on their ability to render a fair and impartial verdict.

The District Court denied the defendants' motion for a new trial. The court found that the defendants had failed to satisfy either prong of the two-part test for a new trial based on juror misconduct set forth in *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

First, the court ruled that juror Baker did not fail to answer honestly a material question at *voir dire,* because Baker's incorrect answers were not made for an "illegitimate purpose" or with a "malicious design." The court found that juror Baker's omissions or misstatements were either inadvertent or based on his belief that he could be impartial. Addressing the second prong of the *McDonough* test, the court found that correct answers to the *voir dire* questions would not have supported a challenge for cause. It found

that Baker's ability to remain impartial was not affected by either the outside contact or his relationship with his brother.

The court also found that a hypothetical, average juror would not have been prejudiced by the extrinsic evidence brought in by Baker.

The defendants advance several challenges to the selection and conduct of the jury. We address those challenges in turn.

**A. In Camera *Questioning of Prospective Jurors for Hardship Excuses***

■ The defendants assert that the District Court committed reversible error by excluding the parties and counsel from *in camera* meetings with the venire members relating to jury service hardship excuses. We disagree.

Federal Rule of Criminal Procedure 43(a) provides that a criminal defendant shall be present "at every stage of the trial including the impaneling of the jury." Fed.R.Crim.P. 43(a); *see also Rogers v. United States,* 422 U.S. 35, 38–39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (criminal defendant has a right to be present from the time the jury is impaneled until its discharge after rendering the verdict); *Lewis v. United States,* 146 U.S. 370, 374, 13 S.Ct. 136, 36 L.Ed. 1011 (1892) ("[T]he trial commences at least from the time when the work of empanelling the jury begins.").

We have held, however, that routine administrative procedures relating to jury selection are not part of the true jury impanelment process in which parties and counsel have a right to participate. In *United States v. Woodner,* 317 F.2d 649, 651 (2d Cir.), *cert. denied,* 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963), we affirmed a conviction after the district court

questioned potential jurors about hardship excuses at the bench in sight of, but outside the hearing of, the parties and counsel. The district court in that case also met with two jurors privately in chambers without a court reporter present to further discuss the jurors' hardship reasons. We "fail[ed] to see the remotest possibility of prejudicial error in [that] procedure," and refused "to presume that prejudice resulted in the absence of some plain showing to that effect." *Id.* at 651–52. Rather, we emphasized our "confidence in the integrity and fairness of the District Judges to assume that they will not make unfair remarks to jurors while undertaking administrative duties of this nature." *Id.* at 652.

Since *Woodner,* we have reaffirmed that hardship questioning is not a part of *voir dire*—and thus not a critical stage of the trial during which the parties and counsel must be present. In *United States v. Williams,* 927 F.2d 95 (2d Cir.), *cert. denied,* 502 U.S. 911, 112 S.Ct. 307, 116 L.Ed.2d 250 (1991), the defendant challenged the practice of the jury clerk, rather than the trial judge, excusing certain venire members on hardship grounds. We upheld the constitutionality of that practice, distinguishing such an " 'administrative impanelment process' " from *voir dire. Id.* at 97 (quoting *Gomez v. United States,* 490 U.S. 858, 874, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (distinguishing *voir dire,* which represents jurors' "first introduction to the substantive factual and legal issues in a case," from the "administrative impanelment process")).

Similarly, in *Tankleff v. Senkowski,* 135 F.3d 235, 247 (2d Cir.1998), we labeled the *in camera* questioning of jurors to eliminate those who had been prejudiced by pretrial publicity "tedious, routine screening." *See also United States v. Candelaria–Silva,* 166 F.3d 19, 31 (1st Cir.1999)

("If a judge does no more than what a jury clerk is authorized to do in excusing jurors, that may raise an issue of allocation of court resources but does not raise an issue of impropriety."), *cert. denied,* 529 U.S. 1055, 120 S.Ct. 1559, 146 L.Ed.2d 463 (2000); *United States v. Calaway,* 524 F.2d 609, 615–16 (9th Cir.1975) (affirming conviction after trial court questioned jurors about hardships *in camera* without parties, counsel, or reporter present), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976).

The defendants' reliance on *United States v. Bordallo,* 857 F.2d 519 (9th Cir. 1988), *cert. denied,* 493 U.S. 818, 110 S.Ct. 71, 107 L.Ed.2d 38 (1989), is misplaced. In *Bordallo,* the Ninth Circuit concluded that either the defendant or his counsel should have been present when the district court excused prospective jurors. *See id.* at 523. In *Bordallo,* however, it was clear that "the prospective jurors knew which specific case they would hear, and some were excused due to factors related to [the defendant's] particular cause." *Id.* This, the Ninth Circuit held, made the situation more analogous to *voir dire* than to mere administrative impanelment. *See id.*

Here, the District Court questioned the prospective jurors prior to announcing the case. As was made clear to the parties, the process employed by the court was standard in Vermont. Accordingly, at least to the extent that the District Court addressed routine administrative matters with the jurors, we fail to see any error in its exclusion of the parties and counsel.

### B. *Failure to Take Action After Juror Revealed Information*

The defendants argue next that the District Court committed reversible error by taking no action in response to juror Baker's *in camera* remarks. We disagree.

■ "The process of empaneling a jury is firmly entrusted to the sound discretion of the trial judge and will not be disturbed absent an abuse of this discretion." *United States v. Rubin*, 37 F.3d 49, 54 (2d Cir.1994). To be sure, a judge who receives important information from a juror should promptly convey that information to the parties and counsel. *See United States v. Aiello*, 771 F.2d 621, 629 (2d Cir.1985) (a judge who in a private meeting with juror learns of unauthorized outside communication "would be well advised" to hold a *voir dire* hearing "[u]nless the communication with the juror is patently innocuous"); *United States v. Taylor*, 562 F.2d 1345, 1366 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977) ("There having been no informed consent to [private communications between judge and one juror during jury's deliberations], it was error for the court not to reveal the substance of these communications to counsel for both sides.").

■ Juror Baker's *in camera* comments, however, could simply not have alerted the court to the nature or significance of Baker's concerns. The court met with approximately thirty jurors, and informed them all that the meetings were solely for the purpose of discussing hardship excuses. When Baker tried to raise other matters, the court told him—correctly—that he should address in open court any matters unrelated to excusal on hardship grounds. Just as it had told counsel it would do, once the court ascertained that Baker did not require an excusal, it ended the meeting and encouraged him to speak at *voir dire*. Baker, moreover, assured the court that he was satisfied with that solution.

Juror Baker's statements at *voir dire*, in turn, likely satisfied the court that Baker's concerns had been aired. Baker mentioned his familiarity with the case from the newspaper; his experience in the National Guard; the fact that his best friend had died from drug and alcohol abuse; and the fact that he knew several witnesses. These statements appear to have alleviated any concerns the court may have had about Baker's *in camera* comments. Nothing would have led a trial judge reasonably to suspect anything other than that Baker had disclosed what was on his mind.

Our decision is not inconsistent with *Taylor*, in which we held that it was error for the district court not to reveal the substance of its private communications with a juror. *See* 562 F.2d at 1366. In *Taylor*, unlike here, the communications occurred during the jury's deliberations, a stage of the trial in which private communications with a juror clearly violate the right to be present. *Id.* at 1365; *see Smalls v. Batista*, 191 F.3d 272, 278 (2d Cir.1999) ("It is well recognized that jury deliberations constitute a critical stage of a criminal trial." (internal quotation marks omitted)). We are unwilling to extend *Taylor* to the situation at bar, in which communications between a judge and a juror occurred during the administrative impanelment process.

Here, though the significance of juror Baker's concerns eventually became apparent, the information available to the court at the time of the administrative impanelment could not have led it to believe that the situation would not be resolved at *voir dire*. We cannot employ hindsight in judging whether the District Court exceeded its allowable discretion. *See United States v. Sanchez*, 790 F.2d 245, 251 (2d Cir.) ("Our review of the district judge's exercise of discretion ... must be based on the relevant circumstances confronting the judge at the time of his ruling, without the benefit of hind-

sight."), *cert. denied*, 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 587 (1986). Accordingly, we conclude that the District Court did not exceed its allowable discretion, given what it knew at the time, in deciding not to convey to the parties and counsel what Baker had mentioned.

### C. Denial of a New Trial

■■■■ We review the denial of a motion for a new trial for abuse of discretion. *See Rivas v. Brattesani*, 94 F.3d 802, 807 (2d Cir.1996) (per curiam). "It is, of course, the rule that a motion for a new trial must be granted if the trial was not fair to the moving party." *Id.* (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940)). "One touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)).

### 1. New Trial Based on Juror Misconduct

In *McDonough*, 464 U.S. at 556, 104 S.Ct. 845, the Supreme Court held that a party moving for a new trial based on juror nondisclosure or misstatements must satisfy a two-part test. First, the party must show that "a juror failed to answer honestly a material question on *voir dire*." *Id.* Second, the party must show that "a correct response would have provided a valid basis for a challenge for cause." *Id.* Both prongs must be met before a new trial may be obtained. *See id.*

In its Opinion and Order denying a new trial, the District Court focused on four instances of nondisclosure by juror Baker: his questionnaire response that no one in his family had been convicted of a crime; his failure at *voir dire* to disclose his outside contact with a third party; his failure to disclose his brother's drug use; and his failure to inform the court that Robert Baker is his brother. In their briefs to this Court, however, the defendants focus exclusively on Baker's failure to disclose his outside contact. Accordingly, we decline to address the other instances of nondisclosure. *See United States v. Zichettello*, 208 F.3d 72, 121 (2d Cir.2000) ("Ordinarily, failure to include an argument in the appellate brief waives the argument on appeal."), *cert. denied*, 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954 (2001); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir.) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."), *cert. denied*, 525 U.S. 1001, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998).[3]

■■■■ Focusing solely on Baker's omissions and misstatements regarding his outside contact, we find it unnecessary to determine whether, under *McDonough*'s prong one, Baker dishonestly answered questions at *voir dire*, because we hold that the District Court did not exceed its

---

**3.** It is true that in his brief Greer mentions Baker's omissions about his relationship with his brother in discussing prong one of the *McDonough* test. This is only in an attempt to bolster his claim that Baker lacked credibility, however, and it is not until his reply brief that Greer even suggests that Baker's omissions regarding his brother would have provided a valid basis for a challenge for cause. Thus, we find that the defendants waived the argument that Baker's omissions regarding his brother satisfy the second prong of *McDonough*. *See Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir.1999) (argument raised for first time in reply brief is waived). Because a party moving for a new trial based on juror misconduct must satisfy both prongs of *McDonough*, we find it unnecessary to reach the issue of Baker's omissions about his relationship with his brother.

allowable discretion in finding that those omissions and misstatements did not satisfy *McDonough*'s prong two. *McDonough*'s second prong requires that a party moving for a new trial show that the correct answer to a question at *voir dire* would have provided a valid basis for a challenge for cause. *See* 464 U.S. at 556, 104 S.Ct. 845. The district court then must determine if it would have granted the hypothetical challenge. *Cf. United States v. Shaoul*, 41 F.3d 811, 816 (2d Cir.1994) (noting that under second prong of *McDonough*, a defendant must have a basis for arguing that the district court is required to sustain his challenge for cause). We review this determination for abuse of discretion. *Cf. Rivas*, 94 F.3d at 807 (denial of new trial reviewed for abuse of discretion); *United States v. Ploof*, 464 F.2d 116, 118–19 n. 4 (2d Cir.) (district court's rulings on challenges for cause reviewed for abuse of discretion), *cert. denied*, 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972).

The District Court found—and we agree—that none of the grounds for a successful challenge for cause existed here. Challenges for cause are generally based on actual bias, implied bias, or inferable bias. *See United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997), *cert. denied*, 523 U.S. 1065, 118 S.Ct. 1399, 140 L.Ed.2d 657 (1998). Actual bias is bias in fact. *See id.* Implied bias, by contrast, is bias presumed as a matter of law. *See id.* at 45. Finally, inferred bias is available when actual or implied bias does not apply. *See id.* at 46–47. "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to ex-

cuse the juror for cause, but not so great as to make mandatory a presumption of bias." *Id.* at 47.

A district court's determination regarding actual bias is reviewed for abuse of discretion. *See United States v. Morales*, 185 F.3d 74, 84 (2d Cir.1999), *cert. denied*, 529 U.S. 1010, 120 S.Ct. 1282, 146 L.Ed.2d 229 (2000); *United States v. Abrams*, 137 F.3d 704, 708 (2d Cir.) (per curiam), *cert. denied*, 525 U.S. 821, 119 S.Ct. 63, 142 L.Ed.2d 49 (1998). "The district court, which 'observ[es] the jury on a day to day basis ... is in the best position to sense the atmosphere of the courtroom as no appellate court can on a printed record.'" *Abrams*, 137 F.3d at 708 (quoting *United States v. Barnes*, 604 F.2d 121, 144 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980)). Based on its evaluation of the testimony at trial and the post-trial evidentiary hearing, the District Court here found no actual bias. The court credited Baker's testimony and also noted that the outcome of the trial demonstrated that all the jurors, including Baker, fairly considered the evidence. The court found that Baker learned "nothing of substance" about the case from his conversation with a third party.[4] We will not overturn such findings absent clear error, and we see no such error here. *See Torres*, 128 F.3d at 44 ("[A] finding of actual bias is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." (internal quotation marks omitted)); *id.* ("Given the special capacity of the trial judge to evaluate actual bias on the part of prospective jurors, that judge's determination in this regard is accorded great deference, since an appel-

---

4. The District Court's determination that it would not have excused Baker for cause as a result of his contact with a third party is supported by the fact that no challenge for cause was made—let alone sustained—with regard to the other venire person who was asked by a third party to lend a "sympathetic ear."

late court [cannot] easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses." (internal quotation marks omitted)).

It is unclear whether our affirmance of the District Court's findings regarding actual bias ends our inquiry, or whether a post-trial allegation of jury partiality may alternatively be proven by implied or inferred bias. *See Smith,* 455 U.S. at 215, 102 S.Ct. 940 ("[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). *But see McDonough,* 464 U.S. at 556–57, 104 S.Ct. 845 (Blackmun, J., concurring) (noting that in exceptional circumstances, post-trial hearing could demonstrate inferred bias). We need not answer that question, however, for we agree with the District Court that neither implied nor inferred bias was present here.

Implied bias does not depend on "determinations of demeanor and credibility," but rather is bias presumed as a matter of law. *See Torres,* 128 F.3d at 45 ("In contrast to the inquiry for actual bias, which focuses on whether the record at *voir dire* supports a finding that the juror was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced."). Drawing on Justice O'Connor's admonition that implied bias should be reserved for "extreme situations," *Smith,* 455 U.S. at 222, 102 S.Ct. 940 (O'Connor, J., concurring), we have cautioned that "automatically presumed bias deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself." *Torres,* 128 F.3d at 45. On this basis, the District Court refused to find implied bias because it found the issues affecting juror Baker to be insufficiently "drastic." Juror Baker was, after all, neither related to a party nor a victim of the

defendants' crimes. Accordingly, in light of our reminder to limit findings of implied bias to extreme situations, the District Court properly refused to find implied bias. *See id.* at 46 ("[T]he situations in which a trial judge *must* find implied bias are strictly limited and must be truly 'exceptional'. . . .").

Finally, a finding of inferred bias is, by definition, within the discretion of the trial court. As with actual bias, "the judge's determination [of inferred bias] must be grounded in facts developed at voir dire." *Id.* at 47. Thus, a district court's evaluation of the juror's impartiality is accorded deference. Here, the District Court refused to infer bias based on its assessment of the evidence. Because we see no error in the court's findings, we decline to overturn that ruling.

In short, we cannot say that the District Court erred in finding no bias that would have supported a challenge for cause. *See Ploof,* 464 F.2d at 118–19 n. 4 ("There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury."). Thus, we affirm the District Court's denial of defendants' motion for a new trial based on juror misconduct.

Our holding does not conflict with this Court's decision in *United States v. Colombo,* 869 F.2d 149 (2d Cir.1989) ("*Colombo I*"). In *Colombo I,* we held that deliberate lies by a juror—lies which reflected partiality on the juror's part—satisfied the *McDonough* test and warranted a new trial. *Colombo I* did not eliminate the second prong of the *McDonough* test. It simply held that a lie which simultaneously demonstrates both dishonesty and partiality on the part of the juror will satisfy both prongs of the test. That is, in *Colombo I,* it was not simply that the lies in question

were deliberate, but that *the deliberateness of the particular lies evidenced partiality. See id.* at 151 (noting that juror's motive in lying was to prevent defense counsel from acting on information the juror believed might lead to her dismissal from the case). This case, however, can be distinguished from *Colombo I,* for the reasons articulated in *United States v. Langford,* 990 F.2d 65, 68–70 (2d Cir.1993). In *Langford,* we held that *Colombo I* did not establish a *per se* rule requiring a new trial whenever an intentionally false answer is discovered. Rather, we emphasized that *McDonough* establishes a multi-part test in which a juror's dishonesty is among the "factors to be considered" in the ultimate determination of bias and that an analysis of bias is required even if the juror's erroneous response was deliberate. Here, as in *Langford,* we have made the ultimate determination of whether the juror was impartial and have found no bias that would have supported a challenge for cause under the second prong of *McDonough.* Accordingly, the present case, like *Langford,* is significantly different from *Colombo I* with respect to the determination of the juror's bias.

### 2. New Trial Based on Jury Exposure to Extrinsic Evidence

The defendants also claim that the extrinsic evidence brought in by juror Baker, *i.e.,* the information regarding his outside contact and his relationship to Robert Baker, prejudiced the jury against them.[5]

 It is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial. *See Remmer v. United States,* 347 U.S.

227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). A government showing that the information is harmless will overcome this presumption. *See id.* "Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." *Bibbins v. Dalsheim,* 21 F.3d 13, 17 (2d Cir.) (per curiam) (internal quotation marks omitted), *cert. denied,* 513 U.S. 901, 115 S.Ct. 261, 130 L.Ed.2d 181 (1994). A "trial court's post-verdict determination of extra-record prejudice must be an objective one," focusing on the information's probable effect on a "hypothetical average juror." *United States v. Calbas,* 821 F.2d 887, 896 n. 9 (2d Cir.1987), *cert. denied,* 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988); *see Bibbins,* 21 F.3d at 17. The court may not inquire into "the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it." *Calbas,* 821 F.2d at 897 (citing Fed. R.Evid. 606(b)); *see Bibbins,* 21 F.3d at 17 (juror's affidavit as to how extrinsic information affected the thinking and voting of the jurors or the deliberations of the jury as a whole was inadmissible). However, in applying the objective test, the court "may appropriately consider the circumstances surrounding the introduction of [the] information in making [its] determination." *Calbas,* 821 F.2d at 896 n. 9.

 In the evidentiary hearing in this case, the District Court asked jurors whether the extra-record information impacted their ability to be fair and impartial. Because this was a post-verdict hearing, that line of questioning was improper. *See Bibbins,* 21 F.3d at 17 (under Fed.

---

5. We do not consider the alleged extrinsic information regarding Greer's drug transactions with Robert Baker. The District Court found that the one juror who testified about such remarks by John Baker was not reliable.

Because this was a finding regarding credibility, we accord great deference to the trial court. *See United States v. Weissman,* 195 F.3d 96, 99 (2d Cir.1999).

R.Evid. 606(b), "[e]ven when a juror attests to receiving information outside the record, the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations"); *United States v. Ianniello,* 866 F.2d 540, 544 (2d Cir.1989) ("Whether the jury relied on improper evidence . . . is not a question to be asked jurors. . . .").

■■■ Nonetheless, the District Court also concluded that the extrinsic information would not have affected a typical juror. After making an "independent determination" as to this issue, *Bibbins,* 21 F.3d at 17, we agree. The outside contact with John Baker presented no information that could have been improperly used in deliberations. No specific details about the case were revealed, and there was no indication that the defendants arranged the call. Similarly, Robert Baker's role in the trial was minimal, and his name arose during testimony which was provided to prove two counts on which the defendants were ultimately acquitted. *See Calbas,* 821 F.2d at 895 (finding no prejudice in part because the extrinsic information "bore most directly on the substantive count, upon which [defendant] was acquitted"). Moreover, as the District Court found, the jury's "complex verdict resulting in convictions on some counts and acquittals on others" demonstrated its fairness. *See United States v. Aiello,* 771 F.2d 621, 631 (2d Cir.1985) (noting that jury's impartiality was demonstrated by the nature of its verdict and careful discrimination in weighing the evidence).

Thus, we agree that a "hypothetical average juror" would not have been influenced by the extrinsic information in this case. Accordingly, the defendants' motion for a new trial based on jury prejudice resulting from extraneous information was properly denied.

## II. *The MDLEA Instruction*

Count Four of the Indictment charged the defendants with conspiring to violate the MDLEA between 1989 and 1991 based on their attempts to offload hashish into Canada from ships in Canadian waters. The evidence produced by the government at trial demonstrated that in 1989 the defendants orchestrated and participated in the offload of many tons of hashish from a vessel in the St. Lawrence River. In 1990, the defendants planned another such offload, but the shipment did not arrive. In 1991, the defendants planned to offload a 60 ton shipment of hashish from two vessels in the Gulf of the St. Lawrence. The effort failed, and barrels of hashish were subsequently discovered floating in the St. Lawrence River. The defendants were arrested after this failed offload.

The MDLEA makes it unlawful for "any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States . . . to knowingly or intentionally . . . distribute . . . a controlled substance." 46 U.S.C. app. § 1903(a). The Act states that "a 'vessel subject to the jurisdiction of the United States' includes . . . a vessel located in the territorial waters of another nation, where the nation consents to the enforcement of United States law by the United States." *Id.* § 1903(c)(1)(E). "Consent . . . may be proved by the certification of the Secretary of State or the Secretary's designee." *Id.* § 1903(c)(1)(E).[6]

---

6. In 1996, Congress amended the statute to provide: "Jurisdiction of the United States with respect to vessels subject to this chapter is not an element of any offense." 46 U.S.C. § 1903(f) (1996), *as amended by* Pub.L. No. 104–324, tit. XI, § 1138, 110 Stat. 3988. Because the 1991 version of the statute ap-

In this case, the defendants were charged with a conspiracy that ended in late July 1991. In July 1996 the defendants were indicted for violating the MDLEA. It is undisputed that the government did not obtain consent from Canada to enforce United States law until after the return of the Superseding Indictment in July 1996.

 The District Court instructed the jury as follows:

> The government has introduced evidence of ... a certification by a designee of the Secretary of State of the United States. This certification alone is sufficient evidence from which you may find that the government has proved beyond a reasonable doubt that the vessels ... were vessels subject to the jurisdiction of the United States.

The defendants challenge this instruction, asserting that because the certification of consent was obtained in 1996, it conferred jurisdiction in 1996. Thus, the certification could not have shown that the vessels were "subject to the jurisdiction of the United States," 46 U.S.C. app. § 1903(a), at the time of the alleged conspiracy. We review the jury instruction *de novo*. *See United States v. Miller*, 148 F.3d 207, 211 (2d Cir.1998), *cert. denied*, 525 U.S. 1072, 119 S.Ct. 804, 142 L.Ed.2d 665 (1999).

 We have not previously had occasion to interpret the MDLEA's jurisdictional provisions. We agree with the District Court, however, that the statute's jurisdictional element may be satisfied by consent provided any time before trial. First, the MDLEA requires the consent of foreign nations for purposes of international comity and diplomatic courtesy, not as a protection for defendants. *See* S.Rep. No. 99–530, at 16 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5986, 6001 ("[O]nly the flag

nation of a vessel should have a right to question whether the Coast Guard has boarded that vessel with the required consent" because the "international law of jurisdiction is an issue between sovereign nations."); *see also United States v. Devila*, 216 F.3d 1009, 1017 (11th Cir.2000) (per curiam), *aff'g United States v. Preciado*, No. 96–0534 (S.D.Fla. Jan. 13, 1998) (order denying motion for new trial) ("The [MDLEA] requires the consent of a vessel's flag nation for jurisdiction to protect the interest of that flag nation and international comity, not the interest of the individuals aboard the vessel."), *cert. denied*, —— U.S. ——, 122 S.Ct. 103, 151 L.Ed.2d 62 (2001); *United States v. Rasheed*, 802 F.Supp. 312, 321 (D.Haw.1992) ("[T]he consent requirement of § 1903 is a courtesy extended to foreign governments, not to drug smugglers."). As such, consent given at any time prior to trial achieves the purpose of § 1903(c)(1)(E).

Moreover, we are persuaded by the fact that several of our sister circuits have found that consent under the MDLEA can relate back to activity that occurred before consent. *See, e.g., Devila*, 216 F.3d at 1017, *aff'g United States v. Preciado*, No. 96–0534 (S.D.Fla. Jan. 13, 1998) (order denying motion for new trial) ("[W]hile the individuals may challenge jurisdiction over a vessel on the basis that the flag nation failed to consent before trial, they may not do so on the basis that the flag nation's consent was obtained after the vessel was boarded."); *United States v. Cardales*, 168 F.3d 548, 552 (1st Cir.) (finding jurisdictional requirement of MDLEA satisfied though consent was provided after boarding of ship by Coast Guard), *cert. denied*, 528 U.S. 838, 120 S.Ct. 101, 145 L.Ed.2d 86 (1999); *United States v. Juda*, 46 F.3d 961, 966 (9th Cir.) ("[W]hen MDLEA jurisdic-

plies to the defendants, this statutory amend- ment has no bearing on this case.

tion is premised on consent of the flag nation, such consent relates back to activity that occurred prior to consent."), *cert. denied,* 515 U.S. 1169, 115 S.Ct. 2632, 132 L.Ed.2d 872 (1995); *United States v. Khan,* 35 F.3d 426, 431 (9th Cir.1994) ("[T]he timing of ... consent is irrelevant."). *Cf. United States v. Aikins,* 923 F.2d 650, 655 (9th Cir.1990) ("The statute is not applied to the defendants ex post facto; although Panama gave its consent after they had set to sea, they took the risk of such consent being given."); *United States v. Reeh,* 780 F.2d 1541, 1547 (11th Cir.1986) (noting that consent under predecessor statute, 21 U.S.C. § 955a, is valid if given "before th[e] case came to trial").

Indeed, the above cases interpreted § 1903(c)(1)(C), an arguably more restrictive provision which involves ships registered in foreign nations, as opposed to § 1903(c)(1)(E), which involves ships in foreign waters. As the District Court noted, 46 U.S.C. app. § 1903(c)(1)(E), the subsection under which the government sought to establish jurisdiction here, provides that a vessel is subject to the jurisdiction of the United States if a foreign nation "consents" to United States enforcement. In contrast, § 1903(c)(1)(C) provides that a vessel is subject to the jurisdiction of the United States if a foreign nation "has consented" to United States enforcement. The difference in statutory language makes the rationale of the above cases all the more persuasive in our context. The fact that courts have allowed consent to relate back even under § 1903(c)(1)(C)—despite its "has consented" language—convinces us that it can relate back under § 1903(c)(1)(E).

Although consent here was given five years after the fact—as opposed to weeks or months—there is no clear rationale for drawing the line at any point prior to the beginning of trial. If consent after the fact is permissible, then it is as logical to allow it years after securing of the vessel as it is days after.

Accordingly, we hold that the District Court's instruction—that consent provided even after prosecution is initiated may establish jurisdiction under § 1903(c)(1)(E)—was not erroneous.

## III. *Sentencing*

Relying on the testimony at trial and at sentencing, the District Court determined that the vast majority of the hashish on board the vessels in 1989 and 1991 was destined for Canada and had been the subject of Canadian prosecution. The court thus concluded that only 2% of the hashish—the amount that entered the United States—should be counted as part of the defendants' relevant conduct pursuant to U.S.S.G. § 1B1.3. This resulted in a U.S.S.G. base offense level of 36. The court added three levels to the defendants' base offense levels for their aggravating roles under U.S.S.G. § 3B1.1(b). The resulting total offense level for each defendant was 39.

Because Greer's criminal history category was II, his U.S.S.G. range was 292 to 365 months; Hutchins's criminal history category was I, and his U.S.S.G. range was therefore 262 to 327 months. The District Court sentenced Greer to 324 months' and Hutchins to 276 months' imprisonment. Both defendants were also fined $500,000.

### A. *The Defendants' Sentencing Claims*

#### 1. *Failure to State Reasons*

Greer and Hutchins request a remand for resentencing because the District Court failed to state its reasons for imposing sentences of 324 months' and 276 months' imprisonment, respectively.

Whether we may review a district court's failure to state its reasons for imposing a particular sentence depends on whether the court imposed a sentence within an applicable Sentencing Guideline range that exceeds 24 months or whether it departed downward and imposed a sentence outside the applicable range. Title 18, section 3553(c)(1) of the United States Code requires a district court to explain its reasons for imposing a sentence at a particular point within a Guidelines range if the range exceeds 24 months. *See* 18 U.S.C. § 3553(c)(1); *see also United States v. Prince*, 110 F.3d 921, 927 (2d Cir.), *cert. denied*, 522 U.S. 872, 118 S.Ct. 188, 139 L.Ed.2d 127 (1997). Title 18, section 3553(c)(2) similarly requires a district court to state its reasons for imposing a sentence outside the range established by the Guidelines—that is, for departing.[7] *See* 18 U.S.C. § 3553(c)(2). However, in *United States v. Hargrett*, 156 F.3d 447, 450 (2d Cir.), *cert. denied*, 525 U.S. 1048, 119 S.Ct. 607, 142 L.Ed.2d 547 (1998), we held that a court's failure to explain the extent of a downward departure—even when the departure is to a sentencing range exceeding 24 months, *see id.* at 450 n. 1—is unreviewable on appeal by a defendant. We noted that 18 U.S.C. § 3742(a) does not allow courts of appeals to review a district court's refusal to grant a downward departure or the extent of any downward departure that is granted. *See id.* As such, a rule that allows review of the failure to explain the extent of a departure would be "anomalous." *Id.* The end result is that we may only review the District Court's failure to state its reasons for the defendants' sentences if those sentences were not the result of downward departures.

Unfortunately, however, the District Court's sentencing remarks are ambiguous. In its "Order: Guidelines Application Issues," the court wrote that, though it had enhanced the defendants' base offense levels by two points for use of an aircraft in importing or exporting a controlled substance under U.S.S.G. § 2D1.1(b)(2)(A), it was departing downward two levels—and thus canceling out the enhancement—because the use of the plane was minimal. Yet in its "Amended Judgment in a Criminal Case," the court stated that the "airplane enhancement will not be applied," and in its "Statement of Reasons for Sentence," the court reiterated that "the airplane enhancement will not be applied." In its oral decision at the sentencing hearing, the court did not mention any airplane enhancement and subsequent departure. In addition, in the "Statement of Reasons" section of the Judgment, the court checked the box for the statement, "The sentence is within the guidelines range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines." Accordingly, the court left blank the next area, which called for reasons for the imposition of a sentence in a range that exceeds 24 months.

Because we find the District Court's remarks ambiguous, we remand for clarification as to whether the court in fact sentenced the defendants within their

---

7. 18 U.S.C. § 3553(c) provides in pertinent part:

The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence—(1) is of the kind, and within the range, [established by the Sentencing Guidelines] and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range; or (2) is not of the kind, or is outside the range, [established by the Sentencing Guidelines], the specific reason for the imposition of a sentence different from that described.

18 U.S.C. § 3553(c)(1), (2).

applicable ranges or downwardly departed to arrive at their sentences. *See United States v. Thorpe,* 191 F.3d 339, 342–44 (2d Cir.1999). If the District Court did not depart downward, it should provide a statement of reasons for imposing the defendants' sentences at a particular point within their applicable ranges, which exceed 24 months, as required by § 3553(c)(1).[8] *See United States v. Zackson,* 6 F.3d 911, 924 (2d Cir.1993) (vacating and remanding for statement of reasons); *United States v. Chartier,* 933 F.2d 111, 117 (2d Cir.1991) (vacating the sentence and remanding because, though record contained some discussion of the judge's reasoning, district court did not "fully comply with the requirement" of § 3553(c)(1)).

### 2. *Hutchins's Fine*

Hutchins argues that his $500,000 fine was improper for two reasons: first, because he did not receive adequate notice that material in the pre-sentence report ("PSR") would be taken into account in determining the fine; and second, because the evidence at sentencing did not support the finding that Hutchins had the ability to pay the fine.

■ Hutchins's claims are without merit. First, contrary to Hutchins's assertion, there is no provision in Federal Rule of Criminal Procedure 32 that requires notice that PSR information will be used in imposing a fine. *See* Fed.R.Crim.P. 32. Rule 32 does require that a defendant be given an opportunity to contest the factual and legal determinations in a PSR. *See* Fed.R.Crim.P. 32(b)(6), (c). This rule, however, is designed "to ensure that the PSR is completely accurate in every material respect, thereby protecting a defen-

dant from being sentenced on the basis of 'materially untrue' statements or 'misinformation.'" *United States v. Reiss,* 186 F.3d 149, 157 (2d Cir.1999). The rule does not require notice of how PSR information will be used. *See United States v. Romano,* 825 F.2d 725, 730 (2d Cir.1987) (Rule 32 and due process require no more than notice of all relevant information that could be used in determining a defendant's sentence and opportunity to object); *cf. United States v. Pimentel,* 932 F.2d 1029, 1032 (2d Cir.1991) (due process requires "notice of all the relevant information that could be used against" a defendant, not how that information will be used).

Here, the PSR was furnished to Hutchins and Hutchins was provided an opportunity to state his objections to the report's contents. The PSR specifically discussed the profits earned by Hutchins. Thus, Hutchins was provided adequate notice under Rule 32.

■ Second, the District Court considered the evidence and found that while the defendants were on bail and during trial, they made approximately $1.7 million in profits from continued drug distribution. These findings are reviewable only for clear error. *See United States v. Sellers,* 42 F.3d 116, 118, 120 (2d Cir.1994), *cert. denied,* 516 U.S. 826, 116 S.Ct. 93, 133 L.Ed.2d 49 (1995). We find no such error and, given those findings, we conclude that a $500,000 fine is reasonable.[9]

### 3. *Sentence for Currency Reporting Violation*

In its reply brief to the defendants' petition for rehearing, the Government notes

---

8. We express no opinion as to whether imposition of the airplane enhancement followed by an immediate downward departure would be appropriate.

9. Hutchins's fine range under the Guidelines was $25,000 to $4 million plus the costs of confinement and supervision.

that Greer was incorrectly sentenced to 120 months' imprisonment, to run concurrently with his other convictions, for his conviction of violating the currency reporting requirements of 31 U.S.C. § 5316(a)(1)(A). The maximum penalty for violating this provision is 60 months and should be corrected on remand. *See* 31 U.S.C. § 5322(a).

## B. *The Government's Cross–Appeal*

The government appeals from the defendants' sentences based on three grounds. First, the government claims that the District Court erred in not including in the defendants' relevant conduct a quantity of drugs that was part of the defendants' offense but that was not intended for distribution in the United States and had already been the subject of foreign prosecution. Second, the government argues that the court should have found that the defendants were leaders or organizers rather than merely managers or supervisors of criminal activity. Finally, the government claims that the defendants directed other conspirators to lie in the grand jury and thus a two-level enhancement for obstruction of justice should have been applied. We consider each of these arguments in turn.

### 1. *Drug Quantity Calculation*

The government challenges the District Court's exclusion of 98% of the hashish on the ships when it determined the defendants' relevant conduct under U.S.S.G. § 1B1.3 for purposes of calculating a base offense level. The court found that the vast majority of the drugs were intended for distribution in Canada, and as such constituted "foreign drugs." The court also noted that the defendants had already been prosecuted and had served time in Canada for the importation of these drugs.

Reviewing the District Court's application of the Sentencing Guidelines *de novo*, *see United States v. Hernandez–Santiago*, 92 F.3d 97, 100 (2d Cir.1996), we hold that the court misapplied § 1B1.3. Section 1B1.3 provides that *all* acts committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant and that occurred during the commission of the offense *shall* be factored into the determination of the base offense level. *See* U.S.S.G. Manual § 1B1.3(a)(1)(A) (1998). Contrary to the District Court's suggestion, nothing in the U.S.S.G. limits their application to "activity undertaken against the United States." Thus, the District Court erred in failing to include the "foreign drugs" in its determination of the defendants' relevant conduct pursuant to § 1B1.3. However, we also note that although foreign drugs may contribute to the defendants' sentence calculation, following *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), on remand the District Court may not sentence the defendant beyond the statutory maximum set by 21 U.S.C. § 960(b)(4) for each of Counts 1 and 4.

Our holding that foreign drugs should be considered under § 1B1.3 is consistent with *United States v. Azeem*, 946 F.2d 13 (2d Cir.1991), in which we held that foreign crimes, that is, crimes not committed against the United States, should not be considered relevant conduct under § 1B1.3. In *Azeem*, the district court included as part of the defendant's relevant conduct drugs transported from Pakistan to Cairo in a separate transaction. *See id.* at 16. Because that transaction "was not a crime against the United States," we held that the drugs should not have counted toward the defendant's base offense level. *Id.* By contrast, the crimes in this case are not foreign crimes; the MDLEA is a United States criminal statute that specifically

covers conduct outside the United States.[10] *See United States v. Juda,* 46 F.3d 961, 966 (9th Cir.) ("Nothing in the language of the [MDLEA] limits its application to defendants who possess drugs intended for distribution in the United States."), *cert. denied,* 515 U.S. 1169, 115 S.Ct. 2632, 132 L.Ed.2d 872 (1995).

The defendants argue that even if the District Court erred in calculating their relevant conduct, no remand is necessary because the court made an "alternative ruling granting a downward departure" based on the foreign nature of the drugs and the Canadian prosecution. While in some cases it may be within a district court's discretion to depart downward due to successive prosecutions, *see Koon v. United States,* 518 U.S. 81, 112, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), we need not decide whether such a departure was appropriate here because our reading of the record leads us to conclude that the District Court did not depart downward. Rather, the court decided that the "foreign" drugs were not part of the defendants' relevant conduct under § 1B1.3 of the U.S.S.G.

At the sentencing hearing, the court stated:

> I didn't want to double penalize Mr. Greer. Theoretically he could have been sentenced under [a base offense level of] 38 and essentially say that he should get credit [for time already served]. But I didn't think that was honest ... with the intention and purpose of the statute, and honest in regard to ... the purpose of the guidelines. This is to penalize American conduct, and if there was a way to delineate American conduct, that's the way it's done. And that's the way I did it, and

that's why [the base offense level] ended up at 36.

The court then indicated several times that because it considered the defendants' culpability in its determination of relevant conduct, a downward departure for successive prosecutions was unwarranted. Moreover, in its "Order: Guidelines Application Issues," the court reiterated that "the fact that these defendants have been prosecuted, convicted and incarcerated for these drugs, which for the most part never reached United States soil, is crucial to this Court's determination of the quantities of drugs for which they should be sentenced here." The court stated that "foreign drugs in all fairness should not be added to the total drug quantity."

■■ It is thus clear that, rather than departing downward, the court factored into relevant conduct under § 1B1.3 the fact that the drugs were destined for a foreign nation and were the subject of foreign prosecution. Because this is a misapplication of the Guidelines, we vacate the sentences and remand for resentencing. The resentencing of the defendants must be conducted in accord with the holding of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *United States v. Thomas,* 274 F.3d 655 (2d Cir.2001). *See United States v. Grimes,* 142 F.3d 1342, 1351 (11th Cir. 1998) ("The general rule is that a defendant should be sentenced under the law in effect at the time of sentencing."), *cert. denied,* 525 U.S. 1088, 119 S.Ct. 840, 142 L.Ed.2d 695 (1999); *c.f. United States v. Kirkham,* 195 F.3d 126, 132 n. 5 (2d Cir. 1999) ("[O]n remand [defendant's] sentence is governed by the version of the Guidelines in effect at the time of resen-

---

**10.** The District Court itself acknowledged that *Azeem* "does not control the outcome here" because the "offloads in this case, unlike the situation in *Azeem,* did not involve a distinctly foreign crime."

tencing."). *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. Title 21 U.S.C. § 960, the statute governing the defendants' sentences for Counts 1 and 4, provides differing penalties according to the quantity of various drugs trafficked by the defendant. Following *Thomas*, it is clear that drug quantity is an element of a § 960 offense "that must be charged in the indictment and submitted to the jury for its finding beyond a reasonable doubt." 274 F.3d at 673; *see also United States v. Chavez*, 267 F.3d 76, 78–79 (2001) (per curiam) (applying an *Apprendi* analysis to a sentence entered under § 960); *United States v. Dennis*, 271 F.3d 71, 74 (2d Cir.2001) (per curiam) (same).

In this case, although quantity was alleged in the defendants' indictments, the District Court instructed the jury that it need not consider the quantity of drugs trafficked by the defendants. Therefore, because we are remanding this case for resentencing so that the District Court may consider "foreign drugs," when recalculating the sentences the District Court must do so in accord with the principles of *Apprendi.*[11] Thus, although the District Court may find, by a preponderance of the evidence standard, the quantity of drugs trafficked by the defendants and use this quantity in its calculations under the Sentencing Guidelines, the resulting sentence cannot exceed the statutory maximum. *See United States v. Garcia,* 240 F.3d 180, 183 (2d Cir.2001) (holding that *Apprendi*

has not affected the district court's authority to determine facts for sentencing at or below the statutory maximum). In this case, the statutory maximum for Counts 1 and 4 is set by 21 U.S.C. § 960(b)(4), which is applicable to a drug importation offense involving an unspecified amount of hashish. *C.f. Chavez*, 267 F.3d at 79 (affirming sentence under § 960(b)(3) for offense involving unspecified amount of heroin).

## 2. *Role in the Offense*

The District Court found that Greer and Hutchins were managers or supervisors of criminal activity rather than leaders or organizers, and, accordingly, increased their base offense levels by three rather than four points for their aggravating roles under U.S.S.G. § 3B1.1(b). The court found that the criminal organization at issue included the Dutch and Canadian groups, and, in the context of this broader enterprise, Greer and Hutchins were simply middlemen. We see no error in this conclusion.

█ "The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.,* all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction." U.S.S.G. Manual Ch. 3, Pt. B, intro. comment (1998); *see United States v. Perdomo,* 927 F.2d 111, 116 (2d Cir.1991). "All conduct" for the purposes of "quantity grouping" cases, such as drug cases, means " 'all acts and omissions that were part of the same course of conduct or common scheme or

---

11. The Government concedes that the defendants' sentences violated *Apprendi,* but argues that we need not recognize the error under the principles of plain error review. Because a remand to the District Court for resentencing is necessary even absent the *Apprendi*

error, we need not consider whether the principles of plain error review articulated in *Thomas* are satisfied. We thus offer no view on whether, absent the District Court's error in regard to foreign drugs, a remand for resentencing would be necessary.

plan as the offense of conviction.'" *Id.* at 117 (quoting U.S.S.G. Manual § 1B1.3(a) and (a)(2) (1998)). A district court's determination of what constitutes the "same course of conduct" under § 1B1.3 is subject to clearly erroneous review. *See id.; United States v. Shepardson,* 196 F.3d 306, 315 (2d Cir.1999), *cert. denied,* 528 U.S. 1196, 120 S.Ct. 1258, 146 L.Ed.2d 114 (2000).

 Here, the course of conduct could reasonably have included the Dutch and Canadian organizations' activities. After considering such factors as decision making authority, claim to proceeds, degree of participation in planning and organization, scope of the illegal activity, and degree of control and authority exercised over others, the District Court found that "at trial and at sentencing it became clear that the real leaders or organizers of this conspiracy reside in Holland and Canada. The roles that Greer and Hutchins played in the overall drug conspiracy were those of couriers, offloaders or mid-level distributors." Such findings do not appear to be clearly erroneous. *See United States v. Napoli,* 179 F.3d 1, 15 (2d Cir.1999) (a "sentencing court's findings as to the defendant's role in the offense will be overturned only if they are clearly erroneous" (internal quotation marks omitted)), *cert. denied,* 528 U.S. 1162, 120 S.Ct. 1176, 145 L.Ed.2d 1084 (2000).

In *United States v. Marino,* 29 F.3d 76, 78 (2d Cir.1994), we refused to consider the defendant's conduct in the context of a much larger enterprise because the enterprise's activities were not included in the defendant's relevant conduct to raise her offense level. Here, by contrast, in light of our holding that the entire quantity of drugs on the ships must be considered as part of the defendants' relevant conduct, it is reasonable to conclude that the defendants were not leaders or organizers with

regard to that conduct. *See id.* ("[I]f [the defendant's] offense level is raised, either in the selection of a base level or by an upward adjustment, . . . a mitigating role reduction might be warranted if the defendant's role in the conduct supporting the higher level is minor."); *see also United States v. Rodriguez De Varon,* 175 F.3d 930, 941 (11th Cir.) (*en banc*) ("[T]he district court must assess whether the defendant is a minor or minimal participant in relation to the relevant conduct attributed to the defendant in calculating her base offense level."), *cert. denied,* 528 U.S. 976, 120 S.Ct. 424, 145 L.Ed.2d 331 (1999).

Thus, the District Court did not err in imposing a three rather than four-point role-in-the-offense enhancement.

### 3. *Obstruction of Justice*

While jailed in the United States and Canada with their co-conspirators, the defendants held discussions about what should be said in the grand jury when the co-conspirators were called to testify. The District Court analyzed the co-conspirators' trial testimony about these discussions, and found that it could not conclude that the defendants directed anyone to lie or obstruct justice. Rather, the court determined, it is plausible that the discussions were merely speculative, and the defendants simply suggested that no one need volunteer extra information. Thus, concluding that the defendants' statements to their co-conspirators were simply part of a joint defense strategy rather than directions to lie, the court refused to enhance the defendants' sentences pursuant to U.S.S.G. § 3C1.1. The government appeals from this determination.

 The government asserts that the court erroneously evaluated the defendants' statements in the "light most favorable" to the defendants. The U.S.S.G. previously instructed courts to view state-

ments "in a light most favorable" to the defendant when deciding whether to apply an obstruction of justice enhancement. *See, e.g.,* U.S.S.G. Manual § 3C1.1 Application Note 1 (1995). However, an amendment to the U.S.S.G., which became applicable before sentencing in this case, removed the "most favorable" language and advised courts simply to "be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. Manual App. C, amend. 566 (effective Nov. 1, 1997).

The government contends that the District Court committed legal error by applying the old standard. We agree. The court stated several times that it was construing the statements in the light most favorable to the defendants. In addition, the court relied on a case, *United States v. Lew,* 980 F.2d 855, 857 (2d Cir.1992), in which we applied the old standard in reversing an obstruction finding. We express no opinion as to whether an obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1 is appropriate here; however, we remand to the District Court so that it may evaluate the statements under the current standard.

### CONCLUSION

For the foregoing reasons, we affirm the convictions and the denial of a new trial. However, we vacate the sentences and remand: (1) for clarification of the record as to the manner in which the District Court arrived at the defendants' sentences, and, if required, a statement of reasons for the sentences imposed; (2) for resentencing in regard to Greer's violation of 31 U.S.C. § 5316(a)(1)(A); and (3) for resentencing based on the District Court's misapplication of the Sentencing Guidelines's "rele-

vant conduct" and "obstruction of justice" provisions. Resentencing must be accomplished in accordance with the principles of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).